**KERSHMAN v. KERSHMAN et ux.**

. No. 6200.

Court of Civil Appeals of Texas. Amarillo.
Feb. 4, 1952.

Rehearing Denied March 3, 1952.

Boyer & Herndon, Perryton, Merle Lansden, Beaver, Okl., for appellant.

Roy Sansing, Higgins, Allen & Allen, Perryton, for appellees.

PITTS, Chief Justice.

This is a habeas corpus action instituted on June 13, 1951, by relator, Mrs. Geneva E. Kershman, of Beaver County, Oklahoma, seeking custody of her daughter, Linda Kershman, 2½ years of age, alleging that she and her husband, Chester R. Kershman, were separated and the child was being illegally restrained and held by her husband's older brother, Martin L. Kershman, and his wife, Lorraine Kershman, of Ochiltree County, Texas. Respondents answered with a general denial and further alleged that they had, by mutual agreement, been given the care, custody and control of the said child by relator and her husband, Chester Kershman, the child's father, until such time as both parents should agree on some other disposition of the said child's custody and that Chester Kershman wanted the child to remain with them.

Without a jury the trial court heard the issues on June 16, 1951, and by judgment awarded temporary custody, care and control of the said chlid to respondents with visitation privileges allowed the parents and further enjoined the removal of the child from the trial court's jurisdiction with all costs adjudged against respondents. Relator has perfected her appeal to this court and predicates the same upon four points of error. The controlling issue to be here determined, however, is whether or not the trial court was justified, under the facts presented and the law governing such matters, in awarding the care, custody and control of the said child to a tenant farmer and his wife who have four children of their own ranging in age from 4 to 12 years rather than awarding it to its 23 year old mother who, through the help of her relatives, could and would establish

a fairly satisfactory home for herself and her children in Beaver, Oklahoma.

It appears from the record that relator grew up as the daughter of Elmer Williams and wife in Beaver County, Oklahoma, near the Texas-Oklahoma state line. Elmer Williams is a prosperous farmer cultivating 1,000 acres of land and owns 560 acres of it. Chester Kershman grew up in Ochiltree County, Texas, some 20 or 30 miles from the Elmer Williams farm. He was one of 12 children reared by his mother, who was living with her fourth husband at the time of the trial. Chester served 2 years or more in the Army during which time he had been married and was divorced from his first wife. On February 10, 1947, after he was discharged from the Army and when he was only 21 years old he married relator who was then only 19 years old. Three children were born to the marriage prior to their separation early in March, 1951 and they were expecting the birth of another child late in September or early in October, 1951. Diana, the oldest child, is a girl and was 3 years of age at the time of the trial; Linda, a girl and the principal child involved in this controversy, was born January 10, 1949; while Eddie is a boy and was 11 months old at the time of the trial. Chester Kershman was a plasterer by trade or a transient laborer moving with his family from place to place, having worked temporarily in Liberal, Kansas, Longview, Texas, Tulsa and Beaver, Oklahoma, and numerous intermediate points between these places. He and his family lived much of the time either with his wife's parents in Beaver County, Oklahoma, or with some of his own relatives who resided in Ochiltree County, Texas, just across the Texas-Oklahoma state line from Beaver County, Oklahoma. The evidence reveals that respondents, with whom Chester and his family lived some of the time, resided 20 miles from Elmer Williams, relator's father. Chester was often away leaving his family either with his relatives or his wife's parents and, according to his own testimony, he often failed to provide sufficient means for their support. He testified that his total income for 1950 was $2,675.44; yet, according to his testimony further, he gave his wife only a total of $570 covering a period of 18 months preceding the hearing in this action. Several letters, written by relator to her husband and introduced in evidence by respondents, revealed that she and the children were left with her parents for some time in 1950, during which time she and the children needed more money to live on than they were getting. He sent some money to them in Beaver, Oklahoma, but it was insufficient to meet their needs. Relator likewise pleaded in her letters for her husband to come and get her and the children provide a home for them but he did not do so. On May 15, 1950, Chester Kershman was arrested in Tulsa, Oklahoma, upon a charge of child desertion, returned to Beaver, Oklahoma, where he was placed in jail and there detained until his father-in-law, Elmer Williams, paid the court costs, got the charge dismissed and Chester was released after he admitted to a deputy sheriff and Elmer Williams that he had not treated his family right and he promised to stay with them thereafter and support them. However, he failed to live up to his promises and the county attorney and the sheriff of Beaver County, Oklahoma, again sought his whereabouts for child desertion in February, 1951, just prior to the separation.

Early in the year 1951 Chester came home from some place. Upon his arrival he found his son Eddie was ill. Relator had taken the child to Doctor Kingle of Perryton who diagnosed the trouble as "Spastic Diplegia", treated the child and referred the case to a child specialist in Amarillo. But Chester had a job plastering in Bonham, Texas, near Dallas, and he and relator decided to take Eddie with them to Bonham where the child would receive medical treatment either in Bonham or in Dallas. Prior to making the trip to Bonham Chester and his wife, relator, by mutual agreement with respondents left Linda with respondents temporarily and left their oldest child, Diana, with another one of Chester's brothers, M. L. Kershman, and his wife who lived at Booker in Lipscomb County, Texas, while they went to Bonham where they planned to have Eddie treated by a specialist either in Bonham or in

Dallas. The child did not receive medical attention during the few days they lived together in Bonham but Chester accompanied his wife and child to the bus station, bought them a ticket and she and the child returned home by bus leaving Chester in Bonham. Relator thereafter took Eddie to the Amarillo child specialist as a result of which his condition was much improved.

An accumulation of existing bad conditions, unpleasant circumstances, broken promises and neglect of his family by Chester Kershman, as reflected by the record, prompted relator to separate from her husband early in March of 1951, and file a divorce action in Beaver County, Oklahoma, there seeking a divorce from him and asking for custody and support of her children. Such a suit was there filed by relator and was still pending when this action was heard. When relator returned to the home of respondents to get Linda, they refused to let her have the child, which resulted in the filing of this action. When relator returned to the home of Chester's other brother in Booker to get Diana, that brother and his wife likewise refused to let relator have Diana but said "they would hand her over" to relator if she succeeded in getting custody of Linda. It therefore appears that final judgment of this action may determine who shall have custody of both of relator's little girls. However, relator testified hat she would seek custody of Diana through court action if need be.

■ Relator has challenged some of the trial court's findings, charging that they are not supported by the evidence. A careful examination of the statement of facts reveals that the evidence does not support the trial court's findings to the effect that relator and her husband stated to respondents that "they were unable to give Linda the proper care and attention she needed and, particularly, medical care" when they left Linda with respondents. There is no evidence to support such a finding.

The trial court likewise made the following finding:

"The father of the child, Chester Kershman, is endeavoring to get located permanently and establish a home for his wife and children and this Court is of the opinion that this will be done, which will be a proper solution of this matter, but in the meantime, the proper medical care, religious training, and the general welfare of Linda requires that she remain in the home of Martin L. Kershman and wife, Lorraine Barbara Kershman, not with the view of remaining there permanently, or for the purpose of adoption, but only temporarily, and upon a proper showing that Chester Kershman and wife, Geneva E. Kershman, have re-established their home, this Court will enter order delivering custody of the child to them, her natural parents."

By such finding the trial court appears to have predicated its judgment, in part at least, upon a speculative finding that has no support in the evidence. There is no evidence in the record even tending to show that Chester Kershman was making any attempt to establish a home for his family or provide for them any better in the future than he had in the past. Although he is not a party to this action, he appeared and testified for respondents. He testified that he attended the trial to see about his children. He further testified that he and his wife were then separated permanently. He asked the court to award his "children" to his brother, Martin Kershman, rather than to his wife, relator, and rather than to himself for he was not "in a position to take care of them." He likewise testified that he was willing for respondents to adopt Linda and he would sign a consent agreement for such adoption. He further testified that he was able financially to support his child Linda and would do so if she were left in the right place but he would not contribute to Linda's support if she should be awarded to her mother for he did not think she would be treated right there. While he testified that his total income for the year 1950 was $2,675.44, there is other evidence tending to show it was even more.

■ The trial court found that relator was of good moral character and such finding is supported by all the evidence, including the testimony of respondents themselves. The principal complaint made against relator by respondents was that she was a poor housekeeper and did not properly look after her children and keep them clean. This issue was strongly controverted with respondents and their relatives testifying against relator concerning the issue except for the testimony of the witness, J. R. Anderson, the stepfather of Martin and Chester Kershman. He testified that relator and her children had lived with him and his wife, who is the mother of the Kershman brothers, much of the time and that relator was clean and kept her children clean and that she was a proper person to have their custody. Four other adult disinterested witnesses gave testimony corroborating that given by the witness J. R. Anderson. The trial court made no finding on this issue, unless such was indirectly made without reference directly to the issue.

However, the evidence reveals that Linda had what Dr. Roy Sanford diagnosed on February 24, 1951, as "acute allergic skin condition involving her face, neck, and ears, which had become, what we call, secondary infected." He further testified that it was "probably a food sensitivity" and that the child was allergic to certain food. He likewise testified that her condition presented a problem difficult to control, especially if not properly cared for; that he had treated her several times and she was much improved but the allergic condition still existed.

The trial court further found that:

"The mother, Geneva E. Kershman, is now pregnant with another child and will give birth to the child sometime in late September, or early October of 1951."

It likewise found that the home to be provided in Beaver, Oklahoma, for Linda by relator would not measure up to the one provided by respondents. The trial court finally made the following finding:

"This Court dislikes to preclude the mother from having access to her child, Linda, but in view of her pregnant condition, and no adequate showing having been made that she will receive proper medical care and other necessary care at the hands of the mother, at least for the next few months, it is for the best interests of the child that she remain in the Martin L. Kershman home in Ochiltree County, Texas, a modern farm home near Booker in Ochiltree County, Texas, and some ten or twelve miles northeast of Perryton."

The evidence reveals that respondent, Martin Kershman, is a tenant farmer of a section of land with a good home large enough to accommodate his family of six (four children) and Linda. He is in debt for some of his household goods and farming equipment in the total sum of $3,100. The uncontroverted evidence further reveals that relator, through the help of her father and a younger single sister, Mary Williams, who is a beautician and operates a business in Beaver, has provided a home with Mary adequate and sufficient for the use and comforts of Mary, relator and her children. Relator's father, Elmer Williams, testified that he had been helping relator and her children for several years and would continue to give them such help as they needed. Mrs. Helen Rock, relator's older half-sister, testified that she and her family reside in Beaver where her husband is in business. She further testified that relator is a good housekeeper and a good mother who cared well for her children. Mrs. Rock manifested an interest in relator and her children and will be helpful to them when needed. Relator testified that she had done the best she could as a mother under the circumstances and with the means provided; that she herself had worked when she could at a laundry, a cafe and other places to help care for the the family needs; that she wanted her children together and wanted to establish a home for them.

■ The evidence reveals that Chester Kershman is an able-bodied young man engaged in a profession or trade that pays him $2.50 per hour or $120 per week when he works, which is a lucrative wage. It is a

penal offense in most jurisdictions for an able-bodied father to refuse to contribute to the support of his children of tender years. If Chester does not voluntarily contribute to the support of Linda and his other children as he is required to do under the law, regardless of who has custody of them, the powers of the courts may be invoked to compel him to do so. The rules of comity between states and public policy apply to the advantage of unfortunate minor children whose father moves to another state to avoid helping to support his minor children. Guercia v. Guercia, Tex.Civ.App., 239 S.W.2d 169, approved by the Supreme Court, Tex.Sup., 241 S.W.2d 297.

In the early case of State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901, the Supreme Court held, in effect, that the discretion of the trial court to be exercised in a child custody case is not an arbitrary one and that before the courts are warranted in depriving a parent, and especially a mother, of the custody of her child of tender years and placing it in the custody of others, it must be conclusively established that such parent is positively disqualified to exercise a proper discharge of parental duties. It further held that such a parent has a paramount right to the custody of an infant child and it must be presumed that such child's interest and welfare will be best promoted by continuing that guardianship which the law has provided until it is made plainly to appear that the parent is no longer worthy of the trust. The court there further observed that the Creator Himself, through His wisdom, has placed upon parents the obligation to nurture, educate, protect and guide their children and has qualified the parents to discharge those important duties by writing in their hearts sentiments of affection and establishing between them and their children ties which cannot exist between the children and any other person. Such is particularly true in the case of a mother and her child. That case was a habeas corpus action filed by a widowed mother seeking to recover possession of her child six years of age. When the child was about two years of age, the mother applied to the respondent, whose wife was related to the mother, to take the said child, rear and care for it as if the child were his own. The mother promised and assured the respondent that the custody of the child would continue with him until it reached its majority and further promised the respondent that she would never take the said child from him. Acting upon such assurances, the respondent and his wife, who were found to be people of good moral character, took the child, gave it excellent care and a good home until the date of the habeas corpus hearing. Nevertheless, under the rules of reason and law heretofore announced, the Supreme Court held that the mother should have her child even after respondent and his wife had kept the child four years and treated it as their own child. That case has since been many times cited and the principles there announced have been adhered to consistently by our courts and these principles are sanctioned by every precept of the law and sentiment of the human heart. This court has in recent years cited that case and followed the rules there announced in the similar cases of Poss v. Anderson, Tex. Civ.App., 188 S.W.2d 726; Cass v. Cass, Tex.Civ.App., 193 S.W.2d 279; Redwine v. Redwine, Tex.Civ.App., 198 S.W.2d 472, and probably other cases. Other Texas courts and courts of other jurisdictions have many times cited with approval the Wood-Deaton case and followed the rules of law there announced. That case is considered the one from which springs the rules of guidance to determine the discretionary powers of a trial court in an action such as this.

It will be remembered that the principal complaint made against relator by respondents was that she was an untidy housekeeper who did not care for her children as she should. This issue was sharply controverted as previously herein stated. It was admitted that she was of good moral character and the trial court so found. In the Redwine case this court reversed and rendered the judgment of the trial court as to the custody of a baby boy the same age as the child here involved and held, with ample authorities cited in support thereof, that, unless the mother is shown

to be unfit to have custody of her child of tender years, she is the proper one to have its care and custody. This court there further held that a mother, who had left her child with others while going out at night for recreational purposes and had been guilty of indiscretions in her conduct, was not disqualified to have custody of the said child but was the proper person to have its custody as against the contentions made by the child's paternal grandparents. Evidence that a mother danced and drank intoxicating liquor did not prove her an unfit mother in the case of Bradley v. Bradley, Tex.Civ.App., 199 S.W.2d 545, as found by a jury and the trial court against the contentions made by a father and his parents. Evidence that a mother had no financial resources did not disqualify her and make her unfit to have custody of her two children as against the contentions of the paternal grandparents where her relatives were willing to help support the children. Turner v. Turner, Tex.Civ.App., 88 S.W.2d 1063. In the case of Fox v. Fox, Tex. Civ.App., 210 S.W.2d 622, 625, there was strong evidence to the effect that a mother was an improper and unfit person to have custody of her child of tender years and the trial court awarded its custody to the father's sister and her husband. The appellate court reversed and rendered that part of the trial court's judgment and awarded the child's custody to its mother, citing the Wood-Deaton case and many others in support of its action. In the Fox case the court held that a trial court must view the evidence in the light most favorable to a parent in determining custody of a child as against an outsider. The court there also said in part:

"The Supreme Court of this state laid down the rule again in the case of Legate v. Legate, 87 Tex. 248, 28 S.W. 281, 282, to this effect: 'Ordinarily, the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another.'

"In the case of Futch v. Futch, Tex. Civ.App., 299 S.W. 289, it is stated the natural affection between a child and its parents constitutes a strong impulse toward good conduct and correct living; it is superior to wealth, honor or power."

 According to the authorities cited and many others, it is our opinion that the record before us does not reveal a condition under which the trial court was warranted in depriving relator of the care, custody and control of her infant daughter. The judgment of the trial court is therefore reversed except as to that part of the judgment adjudging the court costs against the respondents, which part of the judgment is affirmed. Judgment is here rendered awarding the care, custody and control of Linda Kershman to her mother, relator, Geneva E. Kershman, with suitable privileges of visitation by the child's father, Chester Kershman, here allowed. Reversed and rendered in part and affirmed in part.