**ANDERSON et al. v. MARTIN et ux.**
No. 6284.

Court of Civil Appeals of Texas. Amarillo.
March 16, 1953.

Rehearing Denied April 13, 1953.

Aldridge & Aldridge, Farwell, for appellants.

E. T. Miller and Simpson, Clayton & Fullingim, Amarillo, for appellees.

PITTS, Chief Justice.

This appeal is from a child custody hearing in which the controlling issue to be determined is the question of whether or not divided custody between the parents of a child of tender years will be for its best interest, both parents having married again after being divorced from each other. The present spouses, respectively, of the parents of the child were made parties to this action and both of them testified but the contest is between the parents principally and they will be referred to as appellant and appellee. The case was tried to a jury. As a result of its findings, together with additional findings made by the trial court, judgment was rendered awarding custody of the child to its mother and her present husband, who reside in Farwell, Texas, for ten months each year and to its father, who resides in Kansas City, Kansas, for two summer months of each year, from which judgment the mother, appellant herein, perfected an appeal and presents several assignments of error.

The child's father, Earl Martin, joined by his present wife, Vesta Martin, filed this action on June 7, 1951, against his former wife, the child's mother, Caroline Anderson and her present husband, R. W. Anderson, alleging changed conditions since the custody of the child in question, a boy—Robert Scott Martin, was awarded to its mother by order of a court of competent jurisdiction in a proper decree of date June 11, 1947, divorcing its parents, for which reason Earl Martin sought full and exclusive custody of the child, and in the alternative, its custody for at least ten months out of each year. Appellant, Caroline Anderson, joined by her present husband, answered by joining issues with appellee and sought continued full custody of the child.

A lengthy record has been presented here, the statement of facts containing 317 pages giving the testimony of 36 witnesses and numerous exhibits. The father of this child precipitated considerable feeling that resulted in the filing of a Federal charge of kidnapping against him, when he abducted the child here in controversy while it was in its mother's legal custody and playing in the street near the home of its maternal grandparents. The merits of this case can be best understood after giving a full account of the background out of which this controversial action arose.

Earl Martin testified in part that he was born in 1914 and was reared at Shamrock, Wheeler County, Texas; that he was first married to Mary Elizabeth Triplett in 1936, to which marriage one son, Dale E. Martin, was born; that he was divorced from his first wife when the said child was six years of age and the custody of the child was awarded to its mother, since which time he had paid $75 per month for its support until the sum was later reduced

to $40 per month, which sum he has since paid for its support; that his first wife has since married again and the child was twelve years of age at the time he gave his testimony. The record further reveals that Earl Martin later served in the Army and was a commissioned officer when he was married on December 5, 1945, at Camp Edwards, Massachusetts, to appellant, Caroline Levins, who was then serving in the Womens Army Corps as a First Lieutenant. When they were both separated from the Service, they moved to Shamrock, Wheeler County, Texas, where they established their home. In the meantime, their son, Robert Scott Martin, was born on November 15, 1946, while its mother was staying in the home of her parents. Appellant and appellee later separated and appellant was granted a divorce from appellee in the District Court of Wheeler County, Texas, and she also was given the custody of their seven month old son, Robert Scott Martin, with reasonable visitation privileges allowed appellee, its father. The court there further stated in its judgment that the visitation privileges of the father should not be construed as allowing the father to take the child into his own home or the home of near relatives prior to its becoming four years of age and even then only when such would not interfere with the education and general welfare of the child. The court's judgment further directed the child's father, Earl Martin, to pay to its mother, Caroline Martin, for support of the child, a reasonable monthly sum until the child became sixteen years of age. The record reveals that Earl Martin has consistently paid $25 per month for the child's support. The record also reveals that both parents had gone to school and each had a college education and each bore a good reputation.

After the separation and divorce the child's mother, appellant herein, had no place to live but with her parents, Ira S. Levins and wife, who also had a younger daughter, Susan Palmer Levins, living with them. The mother took the child and moved in the home with her parents who lived in Texico, New Mexico, just one block west of the Texas-New Mexico state line.

The city limits of Texico, New Mexico, and Farwell, Texas, join each other and the two towns are separated only by the Texas-New Mexico state line. Ira S. Levins lived with his family just across the state line of New Mexico but operated his business, a picture show, in Farwell, Texas. By necessity, the child's mother got a good position and went to work to support herself and help support the child, who, from its infancy, was partially cared for by its maternal grandmother while its mother was working. The child became an attractive member of the family. Its maternal grandparents naturally manifested much interest in and became attached to it. They assisted its mother in seeing that it had every advantage for growth and development. Although its mother worked and earned a livelihood, she devoted much of her time to church work. She was organist for the church and saw that the child had such advantages as the church could give a child of its age. She also kept in touch with appellee, the child's father, and invited him to visit the child. Mrs. Levins, the child's maternal grandmother, invited the child's father by letter to come visit the child and bring his parents, who lived at Shamrock, Texas. For a period of about four years, Earl Martin seldom visited his said child. According to the record, he actually saw the child during that time only two or three times and then for only a short period, but he remembered the child with appropriate gifts at various times.

Appellee, Earl Martin, married his present wife on February 19, 1949. She had been married before but had no children. Because of the nature of his business, appellee with his present wife, soon moved to Kansas City, Kansas, where they have since resided. He and his brother were engaged in the trucking business, owned 32 or 33 trucks and 18 trailers, which they used in hauling new automobiles from Detroit, Michigan, to Shamrock and Amarillo, Texas. Their joint gross income for the year 1950 was over $100,000.

Appellant and her child continued to live in the home with her parents until she married her present husband, R. W. Ander-

son, October 9, 1949. Anderson was reared in Farwell, Texas, near the Levins' home in Texico, New Mexico. He is vice president of a Farwell bank of which his father is president. After his marriage, he and his wife established a home in Farwell only a short distance from the Levins' home. His wife continued to work. While both he and his wife worked, the child here in controversy continued to spend most of his time with his maternal grandparents but his mother was with him much of the time during evenings and weekends.

On May 10, 1949, prior to her last marriage and again on July 27, 1950, after such marriage, appellant wrote appellee, the child's father, suggesting that her parents, the child's maternal grandparents, adopt Robert Scott, and asked his opinion about the matter. In her said letters appellant related the existence of a happy relationship between the child and other members of the Levins family and said such would give the child "one home, not living between two homes", but she was interested in having his reaction to her suggestion and said she had given the matter much thought and had decided she would sign such adoption papers if he would sign them. He at no time replied to or commented about her suggestion of such a proposed adoption. These letters, together with a later letter written by the child's mother to its father, were introduced in evidence by the father, appellee herein. The last letter mentioned is here copied as follows:

"2 February 1951

"Dear Earl:

"Intended to answer your letter much sooner, but Dad, Susan Palmer and Bob Scott have all three had colds this week and have been in bed. This, of course, has kept us jumping around pretty much trying to take care of them and the theater.

"I certainly hope you don't have to go back into the Army. Matter of fact, I thought you had resigned your commission, but then I guess they can always get you if they make up their minds to get you.

"You know, Earl, you are always welcome here, and anytime you want to see Bob Scott all you have to do is come down. I have a new camera, and as soon as I can understand the gadget, I hope to get some good pictures of the kids. If I do, I shall send you some.

"Hope this finds you and Vestal well and happy.

"Very truly yours,
(Signed) Caroline"

Appellee, Earl Martin, further testified on cross-examination that when he received the last letter which is copied hereinabove, saying, "You know, Earl, you are always welcome here, and anytime you want to see Bob Scott all you have to do is come down", he then made up his mind "to snatch the child", and he actually got the child a month later. Presumably as a matter of caution the trial court interrupted and had the question about taking the child read again by the court reporter, to which the same answer was given again by the witness. He further testified that he, together with his wife, went to Farwell, Texas, early in March of 1951 with his mind made up to get his boy; that he registered himself and wife in a tourist court at Farwell under an assumed name and stayed there five days without contacting the child's mother, her parents or letting his identity be known to anybody; that he was merely observing the child during that time but the child was usually attended by its mother or someone else; that on March 5, 1951, he found the child riding his tricycle and playing with other children in the first block south of the home of its maternal grandparents; that he drove up near the child in his automobile and called the child and told him he had some funny books which he exhibited to the child; that he opened the door, let the child in the car, gave him the funny books and drove away with him; that he and his wife kept the child in their car as they drove out of Texico, New Mexico, into Texas on Highway No. 60 without notifying anybody they had the child; that they drove by way of Hereford, Texas, Vega, Amarillo and on through Oklahoma to their home in Kansas City, Kansas; that they drove all night that night and got into

Kansas City, Kansas, about eight o'clock next morning, where they kept the child until "detectives" and a "tracer" were put on his trail as a result of the kidnapping charge filed against him. He and his wife then took the child and travelled over several states for a period of three months before he returned to Texas early in June and filed this proceeding.

On the night of March 5, 1951, after taking the child, Earl Martin sent a "night letter" by wire from Wichita, Kansas, to appellant telling her the child was all right and she received the message next morning. He later had his brother tell appellant that he had the child. The child's mother had no warning that the child would be taken and was thereafter greatly disturbed about the matter. She immediately visited the home of Earl Martin's parents and the home of his brother, both in Shamrock, Texas, endeavoring to find out where the child was. She wrote Earl, wired him and tried to phone him but got no response. After failing for a week to hear more about the child, a kidnapping complaint was filed against Earl in New Mexico which complaint has since been dismissed. She and her husband employed detectives to try to find Earl and the child. She made two trips to Kansas City and other places in search for them but never found them. She did not hear any more from them until early in June when she learned they were in Shamrock, Texas. On June 6, 1951, she went alone to Shamrock where she found Earl, his wife and the child in the home of Earl's parents, together with other members of the family. She visited the child in the presence of the family and asked Earl to let her have the child, but Earl declined and told her the child would be brought to Amarillo, Texas, the next day on June 7, 1951, where they would meet and work out their difficulties. She returned home without the child but the parties with their attorneys met in Amarillo next day.

■ Although according to the record before us none of the parties had ever lived in Potter County, Texas, and none of the alleged cause of action arose in Potter County, Texas, Earl Martin, joined by his wife, filed this action on June 7, 1951, in the Court of Domestic Relations of Potter County, Texas. On the same day the parents of the child, joined by their respective spouses, filed a joint motion requesting the trial court to commit the child to the care of a lady therein named living in Amarillo, Potter County, Texas, during the pendency of the suit at the joint expense of the parties and with reasonable visiting privileges of the child allowed both parties. The trial court granted the motion and committed the child to such lady on the terms requested but also allowed the child's mother and her husband to take and keep the child in their home until June 18, 1951, when it must be returned to the said lady in Amarillo pending the hearing and such was done. Hearing of the action began on June 28, 1951, before a jury. Before submitting any issues to the jury, the parties hereto and their attorneys were advised by the trial judge, and we think properly so, that he would not agree to be bound by the jury findings and cited the following authorities in support of his statement: Kesler v. McGuire, Tex.Civ.App., 109 S.W.2d 1115, and Marr v. Marr, Tex.Civ.App., 191 S.W.2d 512. These and other authorities hold that the matter of determining the custody of children in a case such as this is for the court and not for a jury, whose verdict is only advisory and may be disregarded. The jury found that there had been a material change in conditions since the child had been awarded to its mother by the Wheeler County District Court on June 11, 1947; that the best interest of the child did not require that it be awarded exclusively to either parent with visiting privileges allowed the other, but that its mother should have its custody during school months of the year.

While the hearing was concluded June 30, 1951, for some reason judgment was not rendered by the trial court until August 11, 1952. However, on June 30, 1951, the trial court entered an order giving custody of the child to its mother subject to its further order, which was not made until August 11, 1952. On August 22, 1952, appellant and her husband executed a su-

persedeas bond and prosecuted this appeal. An extension of time causing delay in submission has been twice granted by this court at the request and upon proper motions filed by the parties.

As previously stated the trial court, as a result of its own findings stated in its judgment in addition to the jury findings, awarded custody of the child to its father each year from 2:00 p. m. o'clock on June 15 to 2:00 p. m. o'clock on August 15 when he should return the child to its mother's home and she was awarded its custody for the other months of the year, the same being the school months. But the trial court also authorized the father to get the child at 3:00 p. m. o'clock the last Saturday of each month while its mother had its custody and keep it until 3:00 p. m. o'clock the following day (Sunday). The trial court likewise adjudged the court costs equally between the parties.

 Appellant has challenged the trial court's finding to the effect that the domicile of the child, Robert Scott Martin, was in Potter County, Texas. In order to constitute domicile, there must be residence of the place, together with intention of making the place of residence one's home. 15 Tex.Jur. 709, § 2. It has been held that "A domicile and a fixed place of residence are synonymous". Slay v. Dubose, Tex.Civ.App., 144 S.W.2d 594, 596, writ refused. It is our opinion that domicile of a child of tender years is the same as that of the parent who has been given legal custody of the child when its parents are separated and divorced unless such parent dies or changes its domicile. It was so held in the case of Peacock v. Bradshaw, 145 Tex. 68, 194 S.W.2d 551. The court held in the recent case of Worden v. Worden, 148 Tex. 356, 224 S.W.2d 187, 190, that, "the wife has the power of establishing a separate domicile for herself and a child she takes with her" when the separation of the parents was caused by the fault of the husband as was shown to be true in this action by the divorce decree of the Wheeler County District Court. The rule is likewise recognized with approval in Campbell v. Stover (Storer), 101 Tex. 82, 104 S.W. 1047; Milner

v. Gatlin, Tex.Com.App., 261 S.W. 1003; Lanning v. Gregory, 100 Tex. 310, 99 S.W. 542, 10 L.R.A.,N.S., 690; Cusack v. Cusack, Tex.Civ.App., 107 S.W.2d 1021. This court so held in the case of Mauldin v. Buchanan, Tex.Civ.App., 198 S.W.2d 469. It is our opinion that this rule was recognized with approval by the Supreme Court in the recent case of Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876, 4 A.L.R.2d 1. In the case at bar it is admitted that the domicile of the child's mother, who had been given its legal custody, was not in Potter County. According to the uncontroverted evidence presented, it is our opinion that all of the parties to the action, including the child, had their respective domiciles outside of Potter County, Texas.

However, the Supreme Court recently held in both the Wicks v. Cox, supra, case and in the Worden v. Worden, supra, case that domicile of the child is not essential to give a Texas court jurisdiction in a child custody hearing where the child and the contesting parties are all before the court. The court further held that ordinarily the trial court where the parties, or some of them at least, have their domicile is in a better position to pass intelligently on the child's welfare and the issues presented but legal domicile of the child is not essential in order to give the trial court jurisdiction in such cases.

In the case of Federal Underwriters Exchange v. Pugh, 141 Tex. 539, 174 S.W.2d 598, the court held there are two classes of jurisdiction, namely, that of subject matter and that of the person. Jurisdiction of subject matter exists by operation of law only, and cannot be conferred upon any court merely by consent or waiver. While jurisdiction of the person can be conferred by consent or waiver.

 In the case at bar all of the parties joined in a motion on the very day this action was filed requesting the trial court to place the child with a person residing in Potter County during the pendency of the suit and such was done with appellant given permission to have the child during the first part of the period. Appellant and her husband joined issues in the action, appeared personally, testified and brought

their witnesses who were heard. Jurisdiction of the person has therefore been conferred we think upon the trial court by agreement or waiver of the parties.

Appellant's principal complaint is directed to that portion of the trial court's judgment dividing the custody of the child between its parents. In some cases divided custody of children between parents has been permissible but the courts are getting further from such a practice because of bitter feelings that have been engendered into controversial issues the results of which detrimentally affect the welfare, health and education of the children involved. So long as the question of custody is not rather definitely settled, some parents are inclined to want to reopen the case in order to express their own feelings about the matter but the desire and feelings of the parent are never controlling over the best interest of the child involved. In such cases parents too often attempt to promote their own interests, protect and defend their own asserted rights when the paramount issue in such a case is the best interest of the child involved and not what might be best for the parents involved. However, an award of custody should never be made in order to punish a parent but only to protect the best interest of the child involved.

In the case of Dunn v. Dunn, Tex. Civ.App., 217 S.W.2d 124, 126, writ dismissed, this court held that divided custody between divorced parents of children of tender years should not be permitted "except under special conditions in which there is no reasonable alternative and it is made essential and absolutely necessary". This court again so held in the following cases: Bezner v. Sawyer, Tex. Civ.App., 217 S.W.2d 858; Immel v. Immel, Tex.Civ.App., 231 S.W.2d 732; Kelly v. Applewhite, Tex.Civ.App., 231 S.W.2d 974. Other courts have so held and the rule controlling such cases is well stated by Judge Alexander of the Waco court in the case of Martin v. Martin, Tex.Civ. App., 132 S.W.2d 426, 428, in the following language:

"In our opinion, the original decree awarding the child part time to each

of the parents was unwise. Certainly, no child could grow up normally when it is hawked about from one parent to the other with the embarrassing scene of changing homes at least twice each year. Such decrees are usually prompted by a laudable desire to avoid injuring the feelings of the parents, but the net result is a permanent injury to the child without any substantial benefit to the parents. In addition to the lack of stability in his surroundings, the child is constantly reminded that he is the center of a parental quarrel. It is readily apparent that such practices are calculated to arouse serious emotional conflicts in the mind of the child and are not conducive to good citizenship. Moreover, the parents are continuously pitted against each other in the unenviable contest of undermining the child's love for the other parent. Each parent is afraid to exercise any sort of discipline for fear of losing out in the contest. As a result, the child is reared without parental control. Such decrees by which the child is awarded part time to each of the parents have been condemned by numerous decisions."

This very same language was quoted verbatim with approval by Judge Blair for the Austin court in disposing of a similar issue in the case of Byrd v. Byrd, Tex. Civ.App., 195 S.W.2d 822. This rule was likewise applied with many authorities cited in support thereof in the very recent case of Ott v. Ott, Tex.Civ.App., 245 S.W.2d 982.

Earl Martin testified that for the past two years he had lived in Kansas City, Kansas, and still resided there; that he would take the child to his home in Kansas City, Kansas, if it be awarded to him; that he had formerly lived in Shamrock, Texas, but was selling his home in Shamrock and had already executed a "delivery of conveyance" to the same; that his child had been well trained by its mother and her parents, for which he was grateful to them; that he had never complained about the child staying in the home of its maternal grandparents; that he, his present

wife and his parents had been invited by the child's mother and her parents to visit the child; that his present wife had never seen the child until they got it in Texico. He further testified that he was denied the privilege of visiting his said child and of having satisfactory visitation privileges with it but such was strongly controverted and the letters he offered in evidence also controverted his testimony in this particular. He likewise testified that he took the child because the divorce decree of the Wheeler County District Court gave him the right to do so. He lived in Wheeler County, Texas, when the decree was entered but he had moved to Kansas City, Kansas, long before taking the child. In construing the use of the term "granted the privilege of reasonable visitation" found in the said Wheeler County judgment the court authorized the child's father to take the child to his home or the home of some near relative after it became four years of age so long as such did not interfere with the welfare or education of the child. By such authorization the Wheeler County District Court did not give permission for the child's father to take it as he did and keep it for three months as he did. This court does not approve or in any manner condone the conduct of Earl Martin in taking the child as he did or in keeping it as he did. There is nothing in the record before us to justify his action in the matter of taking the child as he did.

▉▉ We do not believe that the custody of a child the age of Robert Scott Martin should be so parceled out as to divide the general authority over it. We believe, however, that parents should at least have periodical visiting privileges with their child and should not be denied such, except in extreme cases of unfitness, and no such exception is presented here. Because of the existence here of a bad situation, which, together with all of the other facts and circumstances revealed, it will not be for the best interest of this child to divide its custody between its parents. We believe from the record presented that the parents have culture enough, the best interest of the child at

heart enough and judgment enough to satisfactorily work out a plan for visitation of the child by the parent who does not have its custody.

It is our opinion that the record, and particularly the findings therein made, do not disclose any good reason why the custody of the child should be divided between its parents. Under the record presented, it is our opinion, for the reasons previously stated, that it will not be for the best interest of the child to divide its custody between its parents or to permit the visitation privileges of the father as fixed by the trial court. We therefore reverse and set aside that part of the trial court's judgment dividing the custody of the child between the appellant and appellee and fixing the visitation privileges for the father, and hereby award full custody of the child, Bob Scott Martin, to its mother, appellant herein, Caroline Anderson, with the right of reasonable visitation privileges given its father, appellee, Earl Martin, at reasonable times. All of the court costs accruing in the trial court and in this court are hereby taxed against appellee. Affirmed in part, reversed and rendered in part.

On Motion for Rehearing.

PER CURIAM.

Appellee, Earl Martin, has filed a lengthy motion for a rehearing. We think our original opinion is clear, well supported by the record and properly disposes of the matters presented. However, there may be a need for some clarification.

▉ In his motion for rehearing appellee has lost sight of the general rule so often announced by our courts to the effect that technical rules of practice and procedure are of little importance in determining issues concerning the custody of a child. The welfare and best interest of the child are the paramount questions to be determined. Cook v. Gregg, Tex.Civ.App., 226 S.W.2d 146 (writ refused); Conley v. St. Jacques, Tex.Civ.App., 110 S.W.2d 1238 (writ dismissed).

From the language used by us in our original opinion, it must be presumed that

we, in effect, held and found that the trial court abused its discretion in ordering the custody of the child, Robert Scott Martin, divided between its parents, just as such must have been presumed and, in effect, held in the Byrd case, the Dunn case, the Immel case and other cases cited by us in our opinion. However, in response to charges made by appellee in his motion for rehearing, we here clarify, if need be, our original opinion by specifically stating that such was, in effect, so held in our original opinion and we now expressly reiterate that, under the record before us, the trial court abused its discretion in ordering the custody of the said child divided between its parents. We further find and hold, as we did, in effect, in our original opinion, that the overwhelming weight of the evidence conclusively shows that it would not be for the best interest of this child to so divide its custody and to thereby require it to change homes twice each year and to live a portion of each year under the dominating influence of one family and the other portion of each year in another home and under the control and supervision of another family. To require such would constitute a continuous flustration of the child's mind and have a tendency to destroy the wholesome environments in which a child such as this one ought to live. In our opinion such a divided custody as the trial court authorized would, if complied with, have the effect of disturbing and confusing the life of the child to such an extent that it would be injurious and harmful to its best interest and constitute an extreme disturbance in the peaceful and orderly home life and education, which are essential in the life of a growing child and essential to building good citizenship.

We are aware of the rule that gives the trial court broad discretionary powers in a child custody hearing. But such a rule only authorizes a trial court to use such discretionary powers but it should never abuse them. The supreme court long ago laid down the rule that such a "discretion to be exercised is not an arbitrary one". State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901, 903. That case has since been consistently cited and the said rule there

announced many times approved by our Texas courts. This court recently approved the said rule in the cases of Kershman v. Kershman, Tex.Civ.App., 248 S.W. 2d 809, and Cass v. Cass, Tex.Civ.App., 193 S.W.2d 279.

In the case at bar the trial court entered an order to award part-time custody of the child to appellee, Earl Martin, who resided with his present wife in the State of Kansas and who testified that he would take the child to Kansas if it be awarded to him. Ordinarily courts do not award the custody of a minor child to a nonresident of this State. Dickson v. McLaughlin, Tex.Civ. App., 69 S.W.2d 209. But in the instant case such an award was made for part time by the trial court and the same was done without restricting the child's residence to Texas, which the court had authority to do. White v. Lobstein, Tex.Civ.App., 246 S.W.2d 953, and other authorities there cited. The domicile of the child, even when awarded for only part time to its father as was done here by the trial court, would be the same as that of its father (in the State of Kansas) during the period of time he had its custody since such custody carries with it domicile and domestic status. Mills v. Howard, Tex.Civ.App., 228 S.W.2d 906. The trial court's award of divided custody would not only cause this child to be "hawked about from one parent to the other", as stated by Judge Alexander in the Martin case [132 S.W.2d 428], and thus subject it to conflicting influences of two separate homes and under the supervision and direction of two separate parents with the results previously herein stated, but such divided custody would also cause the child to be "hawked about" between two separate states with separate and distinct legal jurisdiction over the child by separate states every time there would be a change of custody, thus probably making this innocent child of tender years a victim of further controversial conflicts and court battles that would continue to broaden the breach between its parents with a net result of "permanent injury to the child without any substantial benefit to the parents" as further stated by Judge Alexander in the Martin case.

Appellee admitted that while the child was in its mother's custody it was properly disciplined, well trained, healthy, vigorous and well cared for under the supervision of its mother and her parents and that he had never objected to the child staying in the home of its maternal grandparents. Appellee himself was indirectly responsible for the placing of the child in the home of its maternal grandparents. The divorce decree of the Wheeler County District Court shows, in effect, that the original home of the child was disrupted when it was only seven months old because of the fault of appellee, whose conduct deprived the child of the privilege of growing up and being trained under the joint direction and supervision of both of its parents living under the same roof, as a result of which the child was awarded to its mother who had no other place to take it but to the home of her parents. According to the record before us this was not appellee's first experience in participating in the disruption of his own home. He and his first wife had a like experience when another child of tender years of his was also denied the privilege of being reared by the joint efforts of its parents under the same roof. The record further reveals that for some reason appellee has since consistently paid much more for the support of his first child than he ever has for this child, although the Wheeler County District Court left appellee's support of this child largely to his own discretion.

An adult person's future conduct may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation. With this in view, may we again review briefly appellee's deliberate and premeditated conduct with reference to his attitude toward the best interest of this child. By the time the child here in question became well adjusted in a different home and was being well trained by a Christian mother with admitted visitation privileges, both in writing and orally given, accorded the father, he further admittedly registered himself and his present wife under an assumed name in a public lodging place near the home of the child, its mother and maternal grandparents, and stayed there five days without divulging his identity to anybody. During that time he spied on the child and the outlay for a period of five days, seeking an opportunity to "snatch the child" and drive away with it. Late in the afternoon on the fifth day he found such opportunity and executed his admitted premeditated plans. For a period of four years previous to taking the child, he had seen it only two or three times and then only for a brief period while his present wife, who was with him throughout the execution of his plans, had never seen the child. Without notice to anybody and without justification, according to the record before us, appellee and his wife, while both of them being practically strangers to this child of tender years, took it from this good home where it had adjusted itself and was being properly trained and cared for and, in order to evade the "detectives" and "tracers", they drove over eight or ten southern states for a period of three months without contacting the child's mother or advising her anything about the child, except for sending her a "night letter" from Wichita, Kansas, the first night after taking the child telling her that it was all right. When appellee did return with the child, it addressed its mother by her given name "Caroline", whereas it had always called her "mama" before being taken away and upon its return it conducted itself rudely otherwise and differently from its former training under the supervision of its mother. Upon returning to Texas he refused to let the mother have her child and let her visit it only in the presence of others. He selected the forum for hearing the case and, according to the record and our judicial knowledge of distances, he for some reason instituted this proceeding in a strange court, some 100 miles or more from where any of the parties had ever resided, seeking full custody of the child or, in the alternative, its custody for at least ten months out of each year.

We may likewise take judicial knowledge of the fact that the forum selected by appellee for the hearing of this action is one that was created in recent years, not for the use and benefit of people

generally regardless of domicile but only for the use and benefit of Potter County citizens, who as local taxpayers bear the expense exclusively of its operation; a forum which presumably was already so busy with a congested docket that the party litigants in this action waited and were held in suspense for a period of more than 13 months after the trial was conducted before the trial court rendered and announced its judgment, whereas a child custody action should be heard and disposed of with reasonable dispatch.

By his conduct appellee disrupted the quiet, orderly life this child had been living and doubtless gave the child impressions in its early life that it will never forget, but we believe that the process of sound reasoning and the record here reflect that such was a detriment to the child and it must have thereafter taken time to restore its quiet, normal life of satisfactory living.

The trial court found there existed animosity against appellee by the maternal grandparents and R. W. Anderson. None was found to exist before appellee abducted the child and there was no evidence that such then existed. If animosity existed against appellee by any of the child's relatives, it is reasonable to presume that such was provoked by appellee himself. Appellee's unjustified conduct in taking this child as he did was enough to arouse the most earnest sensibilities of all law abiding citizens who knew about it and to bring condemnation upon him by most, if not all, such citizens. Such conduct by appellee broadened the existing breach between the parents of the child to its detriment. However, the record reveals that the parents were getting along unusually well under the previous conditions and circumstances until the occurrence of this very unfortunate incident precipitated solely by appellee.

In his motion for rehearing appellee has sought to challenge several statements made by this court in its original opinion, copying excerpts of such in his motion. A careful re-examination of the record reveals that all of these excerpts quoted from our original opinion are not only supported by the record, but they are all supported either by appellee's pleadings, his admissions made as a witness or by evidence he introduced himself or by all three. His efforts now to discredit any such statements made by us in our original opinion are wholly inconsistent with that part of the record he made himself.

For all of the reasons stated it is our opinion that the trial court committed a grievous error in that part of its judgment reversed by us in our original opinion and its judgment is therefore reviewable by this court. While appellee seems to contend that we are prohibited from doing anything other than affirming the trial court's judgment, we believe it is our duty, after a careful examination of the record, to reverse that part of its judgment that is wrong, as we view the matter, and enter what we believe to be a correct judgment in the cause, as we are required to do under such circumstances according to the provisions of Rule 434, Texas Rules of Civil Procedure. That we have done and we think the record and the law governing such support our actions in the matter, notwithstanding appellee's contentions to the contrary. Appellee's said motion for rehearing is therefore overruled.