## STATE (Herrick, relator) *v.* RICHARDSON.

A father is entitled to the custody of his minor children; and in the case of a child ten years of age, the court, on habeas corpus, will ordinarily award the custody to him, unless it be made to appear that he is clearly unfit for the trust, or has, by some legal act, parted with his parental rights.

Nor will the action of the court be controlled by the wishes of a child of such tender years.

THIS writ of habeas corpus, issued upon the application of the father, Jonathan S. Herrick, was originally returned to Bellows, Justice, on the 7th day of March, 1860, and, after hearing the parties, further proceedings upon it were adjourned to the Supreme Judicial Court, to be held at Concord, in and for the county of Merrimack, on the 15th day of the same March.

The return of the respondent, Daniel F. Richardson, showed the child, Martha Jane Herrick, to be in his custody, but claimed that it was with the assent of its parents, and in accordance with its own wishes. The facts sufficiently appear in the opinion of the court.

*Quincy,* for the relator.

*Blaisdell* and *Duncan,* for the respondent.

BELLOWS, J. It is a well settled doctrine of the common law, that the father is entitled to the custody of his minor children, as against the mother and every body else; that he is bound for their maintenance and nurture, and has the corresponding right to their obedience and their services. 2 Story's Eq., secs. 1343–1350; 2 Kent's Com. 193; 1 Bl. Com. 453; *Jenness* v. *Emerson*, 15 N. H. 486; *Huntoon* v. *Hazelton*, 20 N. H. 389. By statute of 12 Car. 2, ch. 24, he may, by will, appoint guardians for his infant children, who will thereby become entitled to their custody and tuition until they reach the age of twenty-one years. This act has been adopted in this State, and under it testamentary guardians may be appointed. *Balch* v. *Smith*, 12 N. H. 437; *Copp* v. *Copp*, 20 N. H. 284. This power of the father is, however, regarded as a trust, confided to him by the law, upon the presumption that the natural affection of the parent will ensure its faithful execution. He is, in truth, the guardian by nature of his child, and, like other guardians, may, for inability or unfaithfulness, be displaced, and the trust conferred upon another. In England this power is exercised by the king as the *Parens Patriæ*, acting through the court of chancery. *De Manneville* v. *De Manneville*, 10 Ves. 51, cases cited, and notes. In this State a court of chancery has probably a like power, notwithstanding the jurisdiction conferred upon the probate court to appoint guardians " whenever there shall be occasion." Comp. Stat. 384, secs. 1, 4; 2 Story's Eq., ch. 35, 75, and 2 Fonbl. Eq. 225. And the question, then, is, whether the father, under the circumstances of this case, is entitled to the custody of his child, and if so, whether under this process that custody can be awarded to him?

The object of the writ of habeas corpus, in a general sense, is to release a party from illegal restraint; and, when such party has arrived at years of discretion—is *sui juris*, nothing more is done.

But in the case of an infant, too young to decide for itself, the court must of necessity determine where it shall be placed, and, in doing so, must determine to whom the custody belongs. If withheld from that custody, it is deemed to be unlawfully restrained, and when restored by virtue of this process, is deemed to be set at liberty.

The power of the court on habeas corpus to determine the right of custody, and, in proper cases, to award accordingly, is well established by adjudged cases in both the English and American courts. On this point many of the English decisions are collected and considered in *Queen* v. *Clark*, 7 El. & Black. 186, 90 E. C. L. 185. In truth, this jurisdiction in England has been uniformly affirmed, although there has been controversy in respect to the exercise of the discretion of the court when called upon to change the custody of an infant. But the *power* has been conceded from an early date, as appears from *Rex* v. *Delaval*, 3 Burr. 1434, and cases cited. To the same effect are *The People* v. *Mercein*, 3 Hill (N. Y.) 399, and cases cited; *Commonwealth* v. *Briggs*, 16 Pick. 203; *Mayne* v. *Baldwin*, 1 Halst. Ch. 454; *Armstrong* v. *Stone*, 9 Gratt. 102; *State* v. *Clover*, 1 Harr. (N. J.) 419. It is true, that when the person entitled already has the custody, but has abused the trust, the remedy may not be in this form. But in this case the father, and natural guardian of the child, is seeking by this process to have it restored to his custody, and we are required to determine whether, in the exercise of a sound discretion, the custody of the child ought, or ought not to be awarded to the father.

In determining this question the court will take into consideration the right of the father, his ability and inclination to perform faithfully the trust imposed upon him, the present condition of the child, and, if of years of discretion, its wishes upon the subject. *Primâ facie*, however, the right of custody is in the father; and when the application is resisted upon the ground that he is unfit for

the trust, by reason of grossly immoral conduct, harsh usage of his child, or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. *Commonwealth* v. *Briggs*, 16 Pick. 203.

The discretion to be exercised is not an arbitrary one, but, in the absence of any positive disqualification of the father for the proper discharge of his parental duties, he has, as it seems to us, a paramount right to the custody of his infant child, which no court is at liberty to disregard. And while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided, until it is made plainly to appear that the father is no longer worthy of the trust. *People* v. *Mercein*, 25 Wend. 72. The breaking of the ties which bind the father and the child can never be justified without the most solid and substantial reasons. Upon the father the child must mainly depend for support, education and advancement in life, and as security for this he has the obligation of law as well as the promptings of that parental affection which rarely fail to bring into the service of the child the best energies and the most thoughtful care of the father. In any form of proceeding the sundering of these ties will always be approached by the courts with great caution, and with a deep sense of responsibility.

In the case before us, the child, a female, was ten years old in February last, and is quite intelligent and well educated, for her years; and it appears that for nearly the whole of her life she has resided in the family of the respondent, and that it is her wish to remain there. It also appears that the respondent, the maternal uncle of the child, and his family, consisting of his mother and an unmarried sister, are in every way suitable persons to have the charge of such a child, and that it has been treated by

them uniformly with great kindness, and that between the child and the family there exists a strong mutual affection. On the other hand, there is no evidence of the unfitness of the father for the proper discharge of his parental duties toward the child, or of the want of proper parental affection, but the evidence shows both the father and uncle to be highly respectable clergymen of the same religious sect, both suitable persons to have the charge of such a child, and, so far as the evidence goes, having equal means.

Under these circumstances, and upon the principles we have stated, we are satisfied that the father is entitled to the custody of the child, and that, in the exercise of a sound judicial discretion, we are not at liberty to allow his right to be controlled by the wishes of a child of such tender years.

The father is the guardian by nature, and also for nurture. In case of his death, without a testamentary guardian being appointed, the mother is, by the English law, the guardian for nurture. *Queen* v. *Clark,* before cited. This guardianship for nurture,—which means to educate, to bring up, to train,—continues to the age of fourteen years; and during that time such guardian has necessarily the right to the custody of the child, and it could with no propriety be assumed that the child had during that period sufficient discretion to decide for itself on the question of its custody; and so it is distinctly held in *Queen* v. *Clark,* where, in the very able opinion of Lord *Campbell,* C. J., the authorities on this point are cited and examined.

In that case the child, a girl, was ten years and seven months old, and had been placed by the Commissioners of the Royal Patriotic Fund, on the death of its father, a sergeant of marines who was killed in the service during the Crimean war, at a Protestant school in the care of the respondent; and she was placed there, with the assent of the mother, in 1855, and the writ of habeas corpus was issued on the 2d day of January, 1857, at the relation

of the mother, who claimed the custody as guardian for nurture.

It appeared that the child was intelligent beyond her years, and expressed great repugnance to leaving her present school, assigning as her reason, that " as much as she loved her mother, she would not go to a school where she should be taught the idolatrous worship of the virgin and saints."

It appeared, also, that the father had been a Protestant, and that the mother was a Catholic, and desired to take away the child, for the avowed purpose of having her educated as a Catholic.

After much consideration, the Court of Queen's Bench decided that the mother, as guardian for nurture, had a legal right to the custody of her daughter, without regard to the election of the ward, and therefore decreed the custody to the mother ; the court also holding that in such matters it knows of no distinction between different religious sects, and will not interfere with the discretion of guardians as to the faith in which they educate their wards.

By our law, when there is an occasion to appoint a guardian for a minor, he may, if above the age of fourteen years, elect a suitable person for that purpose (Comp. Stat. 384, sec. 2), thus assuming that until that age the infant has not sufficient discretion to exercise even this qualified right of election.

In *Queen* v. *Clark* the court held, that the infant, thus upwards of ten and a half years old, should not be admitted to examination on the subject of its wishes, assuming that so long as the guardianship for nurture continued, the right of custody was ordinarily perfect in the guardian, and could not be controlled by the wishes of the child. A similar distinction seems to be recognized by Chancellor *Kent*, in 2 Commentaries 194. It may be proper to say, that it does not follow that the wishes of the child, after it reaches the age of fourteen years, will control the

State *v.* Richardson.

discretion of the court in these cases. It is sufficient to say, that they will be consulted and weighed, with other circumstances, as in *Rex* v. *Delaval*, where the child was much more than that age.

In this case, there being no evidence that the father is unfit for the trust imposed upon him, there is no solid or substantial ground for refusing to award to him the custody of his child, unless we give to its wishes an influence which is not based upon either authority or reason, and might seriously and extensively interfere with that parental control which is wisely committed to the natural guardian of children.

It is also contended by the counsel for the respondent that the father, by permitting his child to remain so long with its uncle, has waived and abandoned his parental rights, and cannot now recall them—at least in this form of proceeding. And it does appear that during the last sickness of the child's mother, which lasted several years, the child was taken to the respondent's house, at the age of about five and a half months, and there kept at the respondent's expense until August, 1859, when the child visited her father at his house, and was taken sick, and on her recovery he declined to have her go back, and she remained with him until November 5, of the same year, when the respondent went to the father's house, in the absence of himself and his present wife, and took the child, with her free consent, and carried her to his house, where she has ever since remained; and the application for this writ was made February 27, 1860. From the return it appears that the respondent and his mother and sister understood it to be the wish of the mother in her last days that the child should remain and be brought up by them. On the other hand, it appeared that in January, 1854, about eight months after the death of his first wife, the father, having just married a lady suggested by the child's mother shortly before her death, and being

State *v.* Richardson.

desirous of bringing together his family, consisting of four children, including the one in question, went to Hanover for the purpose of taking home this child, but finding its grandmother and aunt extremely unwilling to part with it, and much excited upon the subject, he was induced to return without the child. He testifies, however, that he informed the respondent that he must not consider the child to be his, and this is not denied by the respondent, who testified on the occasion.

In the fall of 1856 there was further correspondence between the father and the respondent upon the subject, and occasionally, from that time until August, 1859; the father stating his desire to have his daughter return to him, and the respondent objecting that it would be hard to part with her, and urging that she should be allowed to remain for the present, until, in the providence of God, as he at one time expressed it, it should be best for her to go home. At another time, in October, 1857, the respondent writes the father that it seems to be settled that he intends to keep Martha, and that in case he took her away they should demand full compensation for keeping her.

Upon the proofs exhibited it does not appear that any agreement was ever made by the father to yield the custody of the child to the respondent, or that he has, in any way, waived or abandoned his parental rights or duties. That he may transfer his parental rights to another by indentures of apprenticeship, is unquestionable; but it is not so clear that he can do so by verbal agreement; and there are several adjudged cases which decide that he cannot. Among these are *Mayne* v. *Baldwin*, 1 Halst. Ch. 454; *People* v. *Mercein*, 3 Hill 399; *State* v. *Clover*, 1 Harr. (N. J.) 419; *People* v. *Mercein*, 8 Paige Ch. 67; *Rex* v. *Isley*, 5 A. & E. 441; *State* v. *Scott*, 30 N. H. 276; *Ex parte Earl of Westmeath*, 1 Jacob 251. Upon this point, however, we give no opinion, as it is not necessary in the decision of this case.

It has been objected, that nothing more can be done in this form of proceeding than to set the child at liberty, and allow it to go where it pleases; but, for the reasons already assigned, we think this objection cannot be sustained. In truth, this process, from its summary character, is eminently appropriate, in many instances furnishing the only efficient and adequate remedy, and thereby preventing that resort to violence which is likely to spring from the necessity of awaiting a more tedious proceeding. There are, doubtless, some decisions which give countenance to the idea that, in a case like the present, the wishes of the child should govern the action of the court; but a close examination of those decisions, with other authorities upon the subject, establishes in our minds the correctness of the conclusions we have stated. In the English courts the doctrine is well settled, as appears by the case of *Queen* v. *Clark*, 7 El. & Black. 186, and the cases cited. A similar doctrine is maintained in *Rex* v. *Grimhill*, 4 A. & E. 624; and in *Rex* v. *Isley*, 5 A. & E. 441, where two children, six and nine years of age, on the death of their mother had been placed in the care and custody of their maternal grand-parents, who had returned from America for that purpose, at the request of the father, and in accordance with the wishes of the mother before her death. The children had been well taken care of by them for about five years, when the father died, and, on application of the testamentary guardian in a form like the present, the custody of the children was awarded to him. The same doctrine is held in *People* v. *Mercein*, 3 Hill (N. Y.) 399, which was very much considered, and the authorities carefully reviewed. In that case the husband and wife were living apart, under an agreement for a separation, and in it there was an agreement that she should be entitled to the custody of the child, notwithstanding which, after several decisions adverse to the father's claim, upon the ground that the tender age of

the child needed the care of the mother, the custody of the child was at length, on habeas corpus, awarded to the father. The child was then about five years old, and no objection was made to the fitness of the mother, but it was held that the father had a legal and paramount right to the custody of the child, which could be enforced, and was not affected by an agreement to alienate to the wife the care and custody of the child; upon the ground that such an agreement was void.

The same general doctrines were recognized on a former application in the same case, reported in 8 Paige Ch. 47, where it was held that the jurisdiction of a court of equity embraces a writ of habeas corpus, and that the court will also act upon petitions without a bill. So in 2 Story Eq., sec. 1340, and note 1. The same views are recognized in *People* v. *Mercein*, 25 Wend. 64; *People* v. *Chegaray*, 18 Wend. 637, and *People ex. rel. Nickerson*, 19 Wend. 637. See, also, 2 Kent Com. 194. To the same effect are *Mayer* v. *Baldwin*, 1 Halst. (N. J.) 454; *Armstrong* v. *Stone and Wife*, 9 Gratt. 102. The case of *Commonwealth* v. *Briggs*, 16 Pick. 203, was a strong one; and, although the child was young (between three and four years only), and in the custody of the mother, yet, on habeas corpus, it was delivered up to the father. In the case of *State* v. *Scott*, 30 N. H. 274, the court, *Woods*, J., held that neither party had a legal right to the custody of the child; the agreement of the mother to commit the child to the care of the Society of Shakers having no binding force, and the right of the mother being lost by the second marriage: therefore it is held that the court have nothing to do but to inquire if the child is restrained of its liberty, and, if so, to set him free. This case, therefore, in no sense conflicts with the views we have expressed, but, on the contrary, assumes that the court may determine who has the legal right of custody, and leaves it open to. a fair inference that a decree might be according to the right.

In coming to the conclusion which we have reached, we cannot contemplate without pain the suffering that may be caused by the breaking of those ties between the respondent's family and the child, which have been the growth of many years of affectionate care ; and, in view of the extreme delicacy of the father's future position, we are unable to withhold one word of caution, and that is, that he may remember the former kindness of the respondent and his family, rather than the present opposition to his wishes ; but, more especially, that, in seeking to develop the virtues, and to promote the happiness of his restored child, he rely more upon the power of parental love than of parental authority.

The custody of the child, therefore, must be awarded to the father.