**In re Johnny HERRERA, a minor.**

**No. 7600.**

Court of Civil Appeals of Texas.

Amarillo.

April 4, 1966.

Rehearing Denied May 2, 1966.

John J. Herrera and Philip M. Shafer, Houston, for appellant.

Stovall & Stovall, Plainview, for appellee.

CHAPMAN, Justice.

This litigation was initiated in the court of original jurisdiction by a writ of habeas corpus caused to be issued by Anita B. Herrera to secure possession of her seven-year old son, Johnny Herrera, from the child's paternal grandparents, Victor Herrera and his wife, Margarita Herrera.

All emphases and parenthetical statements hereinafter made are ours.

Though not divorced, Anita had not lived with the child's father, Jessee Herrera, for a number of years. At least one reason is that Jessee had been in the penitentiary a number of times. The record is not clear as to whether it was three or four sentences to the state penal institution. Another very logical reason they had not lived together during part of the time is that the record shows Jessee had indulged in an "affair" with another woman from whom he had sired at least one child shown in the record. Jessee and Anita were also parents of two daughters, one older and one younger than Johnny.

As in most cases, the testimony is conflicting as to the reason Johnny was in possession of his paternal grandparents. Anita testified she and Jessee had an agreement that while the latter was in the penitentiary Johnny would remain with his paternal grandparents. "He told me to make out with my struggle as best I could with the two girls and to leave the boy with his grandparents."

"Q. Now, did he say that with the idea of your giving him to the grandpar-

ents or for them just to help you with the expenses, to make it less expense on you?

"A. It was with the idea that they help me somewhat with the expenses of the boy because he was unable to do so.

"Q. Was there ever any agreement between you and Jessee that his parents would take the child for adoption and keep him forever?

"A. No, sir."

The grandmother testified Jessee and Anita left Johnny with her when he was two months of age and gave her the child to keep.

Anita lived with her parents at Wharton during part of the time Jessee was in the penitentiary and while there filed a divorce suit against him in which she asked for the custody of all three of the children. The suit was dismissed on February 19, 1965, for want of prosecution. Letters in the record from Jessee while he was in the penitentiary contained great promises of how they would get their children back together when he was released.

Jessee was seriously injured in an industrial accident on February 22, 1965, and died three days later. The Industrial Accident Board awarded $6,000 to Anita and $2,000 each to their three children. They denied claims of an alleged common-law widow and the minor child. We have related these facts only to give the background information preceding the issuance of the writ of habeas corpus.

After a hearing before the court the trial judge denied Mrs. Herrera (Anita) the custody of her son and awarded his custody to the respondents, Victor and Margarita Herrera. From that judgment appeal is properly perfected to this court.

At the very threshold we are met with what appears to us to be a paradox in the findings of the trial court in his judg-

ment and the actual judgment rendered. The findings are that " * * * it is the opinion of the court that the respondents, Victor Herrera and his wife, Margarita Herrera, (the grandparents of Johnny) are fit and proper persons to be awarded the custody of the minor, Johnny Herrera; that the petitioner Anita B. Herrera (the parent), is also a fit and proper person to be awarded the custody of the minor, Johnny Herrera; and based upon the evidence produced in this cause and the circumstances of this particular case * * * it is for the best interest and welfare of the minor, Johnny Herrera, that his custody be placed with the respondents, Victor Herrera, and his wife, Margarita Herrera, * * *"

Thus, a parent upon whom the law at the time of the birth of a child imposes the duty of care and protection, the performance of which the instincts of nature so readily prompts and out of whom the legal custody had never been judicially determined either by a custody hearing, adoption, or dependent and neglected child hearing, was deprived of her child in a judgment which found her to be a fit and proper person to have his custody.

The landmark case in Texas upon the question of the right of a parent to the custody of his or her child in a habeas corpus hearing as against a relative into whose care the child had been committed by the parent is State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901. The court in that case quoted as authority a statement from Weir v. Marley, 99 Mo. 484, 12 S.W. 798, 6 L.R.A. 672, as follows:

" 'What is for the best interest of the infant? is the question upon which all cases turn at last, whatever may be said in the opinion about contracts; and the answer returned is that the custody of the child is by law with the father (parent), unless it appears by satisfactory evidence that the best interest of the child demands that he (she) be deprived of that custody, and upon him who so

avers devolves the burden of proof. The presumptions are against it.' "

The court then held that when a parent has parted with possession of his or her child and seeks to regain possession of it through the courts it becomes the duty of the court to protect the child against the evil results that follow to it from *incompetent and disqualified* parents.

The court then quoted with approval from the New Hampshire case of State ex rel. Herrick v. Richardson, 40 N.H. 272, 275 as follows:

"'The discretion to be exercised is not an arbitrary one, but, in the absence of any positive disqualification of the father (parent) for the discharge of his (her) parental duties, he (she) has, as it seems to us, a paramount right to the custody of his (her) infant child, which no court is at liberty to disregard. And, *while we are bound also to regard the permanent interests and welfare of the child, it is to be presumed that its interests and welfare will be best promoted by continuing that guardianship which the law has provided, until it is made plainly to appear that the father (mother) is no longer worthy of the trust.*' "

There is no holding to our knowledge by any appellate court in Texas that gives the mother any less right to her child withheld from her by third party relatives than the right given to a father under such circumstances, neither being incompetent or disqualified. For that reason, we have inserted into the quotes the parenthetical statements. Thus, the rule just quoted would apply equally as strongly for a mother as for a father.

In "Shepardizing" the *Deaton* case, we have discovered the cases are literally myriad from other Texas intermediate appellate courts following the rule quoted by the Supreme Court in *Deaton* from State ex rel. Herrick v. Richardson, supra. Just a few are the following: Hull v. Hull, Tex.Civ. App., 332 S.W.2d 758 (N.W.H.) San Antonio; Prock v. Morgan, Tex.Civ.App., 291 S.W.2d 489 (N.W.H.) San Antonio; Luman v. Luman, Tex.Civ.App., 231 S.W.2d 555 (N.W.H.) Texarkana; Fey v. Woods, Tex.Civ.App., 229 S.W.2d 923 (writ ref.) Dallas; Carter v. Cade, Tex.Civ.App., 236 S.W.2d 829 (writ ref.) Fort Worth; McRae v. Lamb, Tex.Civ.App., 233 S.W.2d 193 (N.W.H.) San Antonio; Clayton v. Kerbey, Tex.Civ.App., 226 S.W. 1117, 1118 and on motion for rehearing 1119 (writ ref.). Our court alone just since 1943 has followed the holding in *Deaton* wherein the Supreme Court quoted from the New Hampshire case of State ex rel. Herrick v. Richardson at least six times.[1] Also the Commissions of Appeals Courts in their day held likewise. An example is Greenlaw v. Dilworth, 299 S.W. 875, 881.

In the last cited case the Commission of Appeals speaking through Justice Nickels said:

"It is true that the child's welfare is the superior and comprehensive test of custody. Rice v. Rice, 21 Tex. 58; Legate v. Legate, 87 Tex. 248, 28 S.W. 281; State v. Deaton, supra; Castro v. Castellanos (Tex.Com.App.), 294 S.W. 525; Edwards v. Edwards (Tex.Com.App.), 295 S.W. 581; Cecacci v. Martelli (Tex. Civ.App.), 235 S.W. 951; Davis v. Elkins (Tex.Civ.App.), 249 S.W. 1099. *But the presumptions noticed mean that in general the child's welfare and the parent's fitness commonly rest in the natural relation which may not be disturbed save by that rebuttal which exhibits positive disqualification of the parent.* State v. Deaton, supra; Legate v. Legate, supra; Weir v. Marley, 99 Mo. 484, 12 S.W. 798,

---

1. Binion v. Mathis, Tex.Civ.App., 171 S.W. 2d 512 (N.W.H.); Dunn v. Dunn, Tex. Civ.App., 217 S.W.2d 124 (writ dismissed); Kershman v. Kershman, Tex. Civ.App., 248 S.W.2d 809 (writ ref. N. R.E.); Havron v. Havron, Tex.Civ.App., 301 S.W.2d 949 (N.W.H.); Moring v. Dodd, Tex.Civ.App., 380 S.W.2d 777 (writ ref. N.R.E.); Sawyer v. Bezner, Tex.Civ. App., 204 S.W.2d 19 (ref. N.R.E.).

6 L.R.A. 672; State v. Richardson, 40 N.H. 275."

It should be noted that at least two of the Courts of Civil Appeals cases just cited were "writ refused" cases announced since the rule providing such a stamp on a Court of Civil Appeals opinion gives it the same authority as an opinion of the Supreme Court of Texas. In one of those cases, Fey v. Woods, supra, the court said:

"In DeWitt v. Brooks, 143 Tex. 122, 182 S.W.2d 687, 694, our Supreme Court held as follows: 'The plaintiffs contend that since they were admittedly the natural parents of the child, and since the trial court found that they were suitable persons to have the custody of the child, they were, as a matter of law, entitled to its custody. The holding of this Court in the case of State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901, seems to justify that contention."

The other writ refused case cited, as having the authority of a Supreme Court opinion, is Carter v. Cade, supra. The court held:

"In the case of State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901, 903, the Supreme Court reversed a judgment of a lower court and directed that the child be delivered to its mother, quoting with approval from the case of State ex rel. Herrick v. Richardson, 40 N.H. 272, 275, as follows: 'The discretion to be exercised is not an arbitrary one, but, *in the absence of any positive disqualification of the father (mother) for the proper discharge of his (her) parental duties,* he (she) has, as it seems to us, a paramount right to the custody of his (her) infant child, which no court is at liberty to disregard.' "

The Supreme Court of Texas speaking through former Chief Justice Alexander in DeWitt v. Brooks, 143 Tex. 122, 182 S.W.2d 687, 694, held just as the quote from Fey v. Woods, stated; i. e., *since the plaintiffs* "* * * *were admittedly the natural par-*

ents of the child, and since the trial court found that they were suitable persons to have the custody of the child, they were, as a matter of law, entitled to its custody. The holding of this Court in the case of State ex rel. Wood v. Deaton, 93 Tex. 243, 54 S.W. 901, seems to justify that contention."

 We thus have the Supreme Court of Texas itself in DeWitt v. Brooks, supra, interpreting its own opinion in *Deaton* to hold that since the trial court found the parents were suitable persons to have the custody of their minor child, they were, as a matter of law, entitled to its custody. The court went on to hold that since the rendition of the *Deaton* opinion in 1900 the legislature has changed the above rule as to dependent and neglected children such as were being considered in DeWitt v. Brooks, supra, but that question is not in our case. Therefore, if the Supreme Court statement to which we have given emphasis in the preceding paragraph, the writ refused Courts of Civil Appeals cases and the Commission of Appeals case, from all of which we have previously quoted, are the rule of law to be followed in Texas, Anita Herrera was entitled by the judgment of the trial court to her child as a matter of law; this for the reason that the trial court found her to be a suitable parent to have the custody of her child, not theretofore judicially determined to be in anyone else.

We are not unmindful of Chief Justice Calvert's opinion in Mumma v. Aguirre, Tex., 364 S.W.2d 220, in which he stated, "* * * our courts do not normally concern themselves with the righteousness of claims to custody of children; their paramount concern is with the best interests of the children." We do not believe such statement negates the numerous holdings of that court we have cited and quoted from above. He went on to say there are rules by which our courts seek, to some extent, to measure the best interests of young children in making awards of custody, and mentioned the presumption that the inter-

ests of a young child are best served by the awarding of its custody to its natural parents.

To have awarded the child in *Mumma* to its natural parent would have required materially changed conditions and the severing of ties with half-brothers and a half-sister, whereas the custody has never been judicially determined to be out of Anita.

We are also familiar with the Texas Supreme Court statement in Ex Parte Eaton, 151 Tex. 581, 252 S.W.2d 557 wherein Justice Sharp speaking for the court said: "The court in awarding custody of a child should consider that the welfare of the child is the dominant factor in reaching a decision." That case was a controversy between the parents for the custody of children of the marriage and does not in any sense impugn the holdings of that court previously cited herein, the writ refused cases of the Courts of Civil Appeals, and the Commission of Appeals, from which we have quoted.

We are also cognizant of the case of Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876, wherein the Supreme Court of Texas speaking through Justice Garwood, said: " * * * our courts hold * * * that in subsequent litigation between the parties over custody of the child, the parent's right is presumptively superior, and the other party must discharge the burden of showing that the child's best interests will be served by custody in such other party, this despite the solemnity of the agreement or the length of time it may have been acted on in good faith by the other party." It is important to note that the court then confirmed their holding in DeWitt v. Brooks, supra, and stated that the holding therein was not at variance with the statement made in the above quoted from Justice Garwood.

■ Though we believe what we have said disposes of the case, we think it might be well to weigh the evidence of the contending parties, keeping in mind the presumption is that the interests of the child are best served by awarding his custody to its parent.

The grandparents to whom custody was awarded by the trial court reared four sons, none of whom advanced past the first few grades in school. Simon, who testified he would be glad to take Johnny and rear him if anything happened to the grandparents, admitted to having bootlegged beer a few years previously. Anita testified that he also sold liquor from his mother's and father's home when she and Jessee were living together. Simon lives in a two-room house next to his father and mother and has three children of his own. Jessee, as heretofore stated, was sentenced to the penitentiary three or four times, never made a living for his wife and legitimate children and at sometime during the time he and Anita were still legally married sired at least one illegitimate child.

There is not any evidence of earning capacity on the part of the grandmother, who was sixty-one years of age at the time of the award of custody. When the sixty-seven year old grandfather works, which is seasonal, he makes only fifty cents an hour. His only other income is a relief check from the government in the amount of $83 per month. They live in a little three-room house next to a country store called McCoy in Floyd County and their son, Victor, lives with them.

To the credit of the grandparents, the testimony from two school teachers and Mrs. Battey, a P.T.A. room mother, shows Johnny is a well-adjusted child socially and a leader in his room at school. However, the testimony shows he is in a segregated room with other Latin Americans, obviously because of the language barrier.

Now to Mrs. Herrera (Anita), the mother of the child. She lives in Houston, is twenty-seven years of age and her residence is a five-room house with bath. Her niece and the niece's grandmother live with her. Anita and the niece work in a factory at $1.25 per hour, forty hours a week or more and both work extra at a restaurant at $5

per day. They divide the expenses of the home. The elderly lady keeps the children when they are not in school and while their mother is working. Anita's ten-year-old daughter is in the fifth grade, speaks good English and makes good grades. She testified she wanted her child so she could exercise her rights as a mother, and indicated she would send him to school and she hoped to college. His opportunities for an education in both the liberal arts and in trades and crafts would appear to be much greater in Houston with his mother than in his present environment.

If the grandparents could not show better results in rearing their own children during the period of their lives when they would be presumed to be able to exercise discipline, we find it difficult to see how they could be expected to properly rear a grandchild in their old age.

Surely it could not be said that a proper moral environment would not be conducive to the best interest of a child. So far as this record is concerned, the greatest mistake shown against the character of Anita is her marriage to Jessee Herrera. Even with his admitted low morals she seems to have made the best of a bad situation. There was some attempt in the record to discredit her character but the testimony constituted no more than insinuations and innuendoes.

Chief Justice Calvert in *Mumma* suggested the benefit the child there involved would have through the association and companionship of half-brothers and a half-sister. The benefit would appear to be even more where Johnny would have the love and companionship of older and younger full sisters. Additionally, he would have the benefit of the companionship of an older sister who speaks good English, a language he obviously will need to learn if he expects to prepare himself for a better education and a better standard of living than that to which he has been accustomed and to which he has been committed through the custody award made by the trial court.

Since the binding force of the rules of law presume children's best interests require that their custody, never judicially determined to be out of parents, should remain in them as against third parties in the absence of the parent's disqualifications, we hold that presumption was not overcome in this case.

Accordingly, the judgment of the trial court is reversed and the custody of the minor child, Johnny Herrera, is awarded to his mother, Anita Herrera.

## ON MOTION FOR REHEARING

■ In their motion for rehearing appellees have cited five cases in support of their contention that this court erred in holding that third parties seeking the custody of a child never judicially determined to be out of a parent must overcome the rule that the parent's right is presumptively superior, and our holding that the facts did not overcome such presumption. Each of the five cases is clearly distinguishable from ours.

The *Mumma* case heretofore cited involved a change of custody, which does not exist in our case and which involves different rules.

Scozzari v. Curtis, Tex.Civ.App., 398 S.W.2d 819 not only involves a change of custody but facts showing one natural grandparent (who, with his wife, was awarded custody) to be only forty-three years of age and well able financially to care for the child. In the instant case the breadwinner was sixty-seven years of age and a seasonal laborer who earns only fifty cents an hour when he works.

In Taylor v. Meek, 154 Tex. 305, 276 S.W.2d 787 the grandparents had previously been awarded custody of the child and the parent was seeking a change of custody, which, as stated above, involves dif-

ferent rules. The grandparents there were also forty-two years of age and the trial court found upon probative evidence there had been no material change of conditions such as to warrant a change of custody. Our case does not even involve a change of custody.

In Taylor v. Jackson, Tex.Civ.App., 317 S.W.2d 550 the trial court found the grandparent and his wife were fit and proper persons to have custody of the child but that the parent seeking its custody was not a fit and proper person. As to the fitness of the parent the direct opposite was found by the trial court in the instant case.

In Spangler v. Breashears, Tex.Civ.App., 359 S.W.2d 206 the children involved were found by a jury to be dependent and neglected children and the intervening grandparents seeking custody were found to be not fit and proper persons to have custody of the children. The natural parents were not even seeking custody and had signed written consents for adoption to parties unrelated to them.

Appellees take us to task in their motion for rehearing for holding that courts of this state are bound to regard the permanent interests and welfare of the child but *such interests and welfare are presumed to be best promoted by continuing that guardianship which the law has provided until it is made plainly to appear that the parent is no longer worthy of the trust.* Yet, they do not seek to distinguish the long line of cases by the Texas Supreme Court since 1900 so holding. Additionally, the learned trial court resolved the question of the fitness of the parent by finding from a preponderance of the evidence that she is a fit and proper person to keep the custody of her own child, which custody had never been judicially determined to be in any other. (Emphasis added).

Accordingly, the motion for rehearing is overruled.