v.

DALLAS COUNTY CHILD WELFARE
UNIT, Appellee.

No. 05–85–01411–CV.

Court of Appeals of Texas,
Dallas.

Feb. 10, 1987.

Rehearing Denied April 8, 1987.

William V. Dorsaneo, III, Barbara B. Evans, Tom Wilson, Dallas, Randall A. Antonson, Duncanville, for appellants.

Ellen A. Abbott, Dallas, for appellee.

Before GUITTARD, C.J., HOWELL and SCALES, JJ.

HOWELL, Justice.

D.L.M. (Father) and N.S.M. (Mother) appeal from the trial court's order terminating their parental rights with respect to their daughter (Child). We agree with the parents' contention that the evidence adduced is factually insufficient to support termination. Therefore, we reverse the trial court's judgment and remand the cause.

This case is burdened by a complicated procedural and factual history. Child was born in August 1980. Father and Mother separated in 1982, with Mother retaining custody of the child and Father visiting the child. Father became concerned that Child was suffering physical abuse, including being bitten. A complaint was made to child welfare personnel who failed to confirm the abuse charges. During 1983, Father began to suspect sexual abuse. On several occasions, he took the child to hospitals for examination, but the physicians found no physical evidence of abuse. Mother and Father were divorced in June 1984. Father was named managing conservator and

Mother was made possessory conservator. That month, an examining physician found tear spots in Child's hymenal ring, indicative of at least some penetration. The torn spots were inconsistent with self-inflicted or accidental penetration. Child Welfare personnel interviewed the child on videotape. Child stated that during the prior week her maternal grandfather had placed his "pony" (penis) in her vagina and in her mouth. She also related that he had previously inserted his fingers in her vagina. She stated that Mother was present at the time of the incident.

Throughout the summer of 1984, accusations continued. The attorney-ad-litem filed a motion for new trial and petition to terminate the parental rights of both parents. In October 1984 the parents were made joint temporary managing conservators. In January 1985 the child again stated in a child welfare interview that the maternal grandfather had placed his finger in her vagina. Presented with this evidence, the trial court named appellee, the Dallas County Child Welfare Unit of the Texas Department of Human Resources, as temporary managing conservator and the child was placed in a foster home. A trial of the motion for conservatorship and termination was held in July 1985. Subsequently, the court rendered the decree of termination for both parents which is now before us.

The trial record is voluminous, including the testimony of the witnesses, depositions, case notes, medical records, psychological evaluations, diaries, and three videotaped interviews of the child herself. Regrettably, the abundance of evidence failed to illuminate a very murky factual situation. We appreciate the trial court's efforts to grapple with this case, but we are unable to find that the decree of termination is adequately supported by the evidence.

■ Parental rights may only be terminated involuntarily if the court finds that the parent has engaged in conduct described in section 15.02(1) of the Family Code and also that termination of parental rights is in the best interest of the child. Termination is one of the most intrusive actions available to the State, completely and irrevocably severing the parent-child relationship. For this reason, due process demands that the State establish its case by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768–69, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982); *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980). Clear and convincing evidence has consistently been defined as "that measure or degree of proof which will produce in the mind of the trier of fact, a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.D.*, 664 S.W.2d 851, 852 (Tex.App.—Fort Worth, 1984, no writ); *Allred v. Harris County Child Welfare Unit*, 615 S.W.2d 803, 805 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.).

The next proposition to be examined is the proper scope of this court's review. The Beaumont court of appeals has emphasized that "district courts are vested with discretion in determining child custody cases, including situations which involve the removal of a minor from his or her parent's custody" because "the trial court is in the best position to observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record." *In re J.D.H.*, 661 S.W.2d 744, 746 (Tex.App.—Beaumont 1983, no writ). The Austin court has stated:

> Once made the decision of the trial court will not be disturbed unless it appears from the record that there was an abuse of discretion. Normally, as a corollary to this rule of broad discretion, it would matter not what this Court might have done under the circumstances had we heard the evidence; we would only be permitted to determine whether such broad discretion had been abused.

*Turner v. Lutz*, 685 S.W.2d 356, 359 (Tex.App.—Austin 1984, no writ). *See also In re R.L.*, 620 S.W.2d 249, 252–53 (Tex.Civ.App.—Amarillo 1981, no writ) (holding that although some probative evidence supported termination, such evidence was not

on balance clear and convincing). We apply the test set forth by this court in *Neiswander v. Bailey*, 645 S.W.2d 835, 836 (Tex.App.—Dallas 1982, no writ) (the task of the appellate court is to determine "whether the trier of fact could reasonably conclude that the existence of the fact is *highly probable* ") (emphasis added). With this test in mind, we review the evidence to determine whether the trial court could reasonably have concluded that the facts underlying the termination were highly probable.

## EVIDENCE CONCERNING THE MOTHER

■ The trial court found that Mother had engaged in conduct detrimental to Child's physical and emotional well being. It found that Mother's father had sexually abused the Child and that Mother had failed to move from the grandparent's house, where Mother had been living after her separation, or to take any other steps to protect Child from the grandfather.

There is some evidence of probative force to support these conclusions. The physical examinations of Child in June 1984 establish a high probability that Child had been sexually abused. Dr. Paul Prescott of the Children's Medical Center estimated that Child's hymenal ring had been damaged some two to four weeks before the examination. During this period, Child was primarily in Mother's care.

Dr. Billy Clifford Roland, a professor of psychology at East Texas State University interviewed Child on several occasions. He reported that Child related that she had been sexually abused by Mother and by the maternal grandfather. He further testified that he believed Child had actually been abused because she was able to relate her experiences in a sequential and coherent manner and because she displayed sexual knowledge far beyond that expected of a child her age.

Paul McLeon, a Child Protective Service Specialist with the Department of Human Resources became involved in the case in June 1984. He interviewed all the participants, including the videotaped interview with Child where she related that her grandfather had placed his penis in her vagina and mouth. McLeon expressed doubt about Child's version of events but did note Child's casual attitude toward sexual matters.

On the other hand, considerable evidence suggests that neither the maternal grandfather nor Mother abused the child. Lisa Blue, a psychologist and attorney with the District Attorney's office interviewed Child in July 1984. She concluded that Child's matter of fact approach in describing the abuse incident was inconsistent with the usual profile of sexual abuse victims. She felt that Child had been "programmed" with a story about abuse.

Lindsey Kirk, a Duncanville police officer, interviewed Child in July 1984 when Father brought her to the Duncanville police station. Child at first described abuse by the grandfather. After some time, Child indicated to the officer that she wanted to tell a secret. Child then said that the earlier story was not true and that "it didn't happen." Officer Kirk testified that she believed Child was only reciting a story when she recounted the abuse incident. This opinion was supported by officer Tim Huskey, who had been listening to the interview from behind a partition.

Dr. Joan Garner, a psychologist, performed evaluations of Child, Father and Mother in March 1985. Child denied any sexual contact during her sessions with Garner. The doctor reported that her evaluation of Mother revealed no serious pathology and indicated a personality type inconsistent with profiles of sexual abuse. Garner concluded that Child's principal exposure with regard to her mother was "passive abuse" upon a finding that Mother's personality indicated extreme passivity.

Susan Jones, a Counselor at the Rape Crisis and Child Sexual Abuse Center, was brought into the case by Father. After seeing Mother and Child at Mother's home, Jones concluded that Child's relationship with the maternal grandfather was inconsistent with that found in abusive situations.

Lynn Miles was the Department of Human Resources caseworker in charge of the case from November 1984 to the time of trial. She concluded after a number of visits with Child and with both parents that Child had a good relationship with Mother. Miles conducted the January 1985 videotaped interview in which Child stated that the maternal grandfather had scratched the inside of her vagina. Miles testified that she doubted Child's account because it was virtually identical to the account given by Father before the interview and because it was given in a matter-of-fact adult manner without the emotion usually observed with child victims.

Miles conducted another videotaped interview in April 1985, some three months after the child's removal to foster care. In this final interview, Child emphatically denied that anyone had touched her vaginal area.

The report of clinical psychologist Barbara Rila appears in the record. Rila evaluated the maternal grandfather and reported that he was unlikely to have committed sexual abuse.

In sum, the trial court was confronted with the following difficulty. The evidence indicated a high probability that Child was sexually abused in some way, but it did not disclose a likely perpetrator. Child's own version of the events was of questionable credibility given the tendency to retract her story and the strong possibility that she has been coached or programmed. On balance, we hold the evidence insufficient to establish that it was highly probable that Mother abused Child, either actively or through failure to protect Child from the grandfather.

### EVIDENCE CONCERNING THE FATHER

■ The trial court found that Father endangered the physical and emotional well being of Child by conducting frequent vaginal examinations to check for penetration. The examinations began when the abuse accusations commenced in 1983 and continued until the child was placed in foster care in 1985, despite the recommendations of the psychologists and caseworkers that he not examine the child's vagina. The witnesses, with the exception of Dr. Roland condemned the examinations. The general consensus was that Father's "hypervigilance" of Child's vagina was unhealthy. Department of Human Resources specialist Paul McLeon stated that the pattern of examination and accusation created a situation where the child perceived the world as revolving around her genitals. Psychologist Joan Garner stressed the need to desexualize the child's life.

We do not condone Father's actions and share the concerns expressed by the learned professionals. Nevertheless, we are unable to find it highly probable that Father endangered the physical and emotional well being of Child, a prerequisite to the termination of parental rights. Our decision is based upon the following observations:

1) Father's actions, although inappropriate, appeared to have been motivated by a sincere concern for his daughter's welfare. He repeatedly took daughter to physicians for examinations, took her to therapy, and attended a college level seminar on child sexual abuse.

2) The witnesses have failed to identify specific pathology or long term harm that the child will suffer as a result of Father's actions. There is no evidence that Child was traumatized by the experience.

3) Father was never placed under order by the court not to undertake vaginal examinations. Neither did the court explore less drastic measures possibly available to curb Father's actions such as placing the child under supervision.

■ Father's actions reflect a certain degree of unhealthy obsession; yet the record shows him to be a concerned and loving parent. A court should be loathe to terminate parental rights where love and concern is exhibited in an "inappropriate" manner, certainly not unless the conduct constitutes an immediate and palpable threat to the child's well-being. This is particularly true where, as here, less drastic alternatives remain unexplored.

The decree of termination is reversed. This cause is remanded to the trial court for further proceedings consistent herewith.