# IN THE SUPREME COURT OF TEXAS

═══════════
No. 20-0378
═══════════

IN THE INTEREST OF J.F.-G., A CHILD

═══════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS
═══════════════════════════════════════

JUSTICE BLACKLOCK, joined by JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BUSBY, dissenting.

The termination of parental rights "is one of the most intrusive actions available to the State." *N.S.M. v. Dall. Cnty. Child Welfare Unit*, 747 S.W.2d 814, 815 (Tex. App.—Dallas 1987, no writ). Because of the constitutional concerns implicated by the State's decision to sever the natural bond between parent and child, termination proceedings must be "strictly scrutinized," and involuntary termination statutes should be "strictly construed in favor of the parent." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

Involuntary termination of a parent-child relationship requires two discrete findings, both by "clear and convincing evidence." TEX. FAM. CODE § 161.001(b). First, the parent must have committed one of the predicate acts described in subsections 161.001(b)(1)(A)–(U). Second, the termination must be "in the best interest of the child." *Id*. § 161.001(b)(2). The predicate finding precedes the best-interest analysis, and the two are distinct inquiries. By requiring the predicate finding, the legislature has denied courts the authority to terminate a parent-child relationship

based solely on what judges or juries think is best for the child. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The statutory predicates are important substantive protections for parents because they limit the pool of termination-eligible parents and thereby limit a court's authority to terminate parental rights based on generalized concerns about the parent's fitness or the child's well-being.

The trial court heard abundant evidence that the reckless behavior of Mother and her boyfriend endangered "Julie." At issue in this appeal, however, is whether Father—who was in prison when the endangering conduct occurred—himself engaged in "conduct . . . which endanger[ed]" his daughter's "physical or emotional well-being" within the meaning of subsection 161.001(b)(1)(E). This Court has long held that "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533. After that holding, the legislature reinforced the point by identifying certain categories of imprisonment that *would* render a parent eligible for termination of rights. *See* TEX. FAM. CODE § 161.001(b)(1)(Q). The legislature also identified certain crimes that make parents automatically termination-eligible. *See id*. § 161.001(b)(1)(L). By identifying *particular* crimes and *particular* terms of imprisonment that make parents termination-eligible, the legislature ratified this Court's holding in *Boyd* that not *all* crimes and not *all* imprisonments make parents termination-eligible, whether under subsection (E)'s endangerment prong or otherwise.

Father committed a crime and went to prison for it. He has since been released, and the evidence shows he has made substantial progress toward turning his life around. For present purposes, the important point is that neither the crime he committed nor the time he served makes him eligible for termination of his parental rights. The Court nevertheless upholds the endangerment finding under subsection (E) based on little more than Father's past commission of

2

crimes (none of which is termination-eligible on its own) and his lack of intimate involvement in his daughter's life from prison (a nearly impossible standard for imprisoned parents to meet).

The legislature's enumeration of termination-eligible crimes and termination-eligible prison terms should inform our understanding of whether a parent's criminal history or imprisonment history makes the parent termination-eligible. In my view, in order for Father's criminal history or imprisonment history to amount to endangerment under subsection (E), they must be accompanied by facts that make his crimes or his imprisonment uniquely dangerous to his child. No such facts exist here. The Court upholds the endangerment finding based solely on Father's criminal history, his imprisonment, and the normal disruptions in family life caused by imprisonment. If that is enough, then as a practical matter, it is no longer true that "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533.

* * *

Father was termination-eligible under subsection (E) if clear and convincing evidence showed that he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). In isolation, the provision can be read broadly, and some may be tempted to view it as a catch-all that essentially requires nothing more than a showing of one instance of bad parenting. But if subsection (E) is so capacious as to render the legislature's painstaking enumeration of other predicate acts superfluous—and to essentially conflate the predicate and best-interest inquiries—then one wonders why the legislature bothered with such a complex statute.

The better understanding of subsection (E) takes into account our obligation to "read [section 161.001] as a whole and . . . give effect to every part." *Jones v. Fowler*, 969 S.W.2d 429,

3

432 (Tex. 1998). On that score, section 161.001(b)(1)'s other enumerated grounds shed light on the sort of "endanger[ment]" contemplated by subsection (E). Subsection (Q) provides for termination if a parent has "knowingly engaged in criminal conduct that has resulted in [his] conviction" and "imprisonment and inability to care for the child for not less than two years from the date of filing the [termination] petition." DFPS does not argue that Father's incarceration meets these criteria. To conclude that his imprisonment alone nonetheless amounted to endangerment under subsection (E) would ignore the legislature's choice that only *some* imprisonment terms automatically make a parent termination-eligible. It is no answer to point out, as the Court does, that Father "committed increasingly serious crimes" that resulted in increasing "periods of imprisonment." *Ante* at ___. Unless such crimes result in Father's imprisonment "for not less than two years from the date of filing the [termination] petition," his mere absence caused by incarceration cannot, standing alone, amount to "endanger[ment]" under subsection (E), unless (Q) is to be treated as redundant.

"[T]here are times when redundancies are precisely what the Legislature intended." *In re Estate of Nash*, 220 S.W.3d 914, 918 (Tex. 2007). But in general, "we should avoid, when possible, treating statutory language as surplusage." *Id.* at 917–18. We have been particularly careful not to read general language in a statutory provision so broadly as to encompass—and thereby render superfluous—specific items in a list within the same provision.[1] Yet that is essentially what the Court does by allowing the general subsection (E) to swallow up the more specific subsection (Q).

---

[1] *See, e.g.*, *Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 805 (Tex. 2019); *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 442 (Tex. 2011); *Randol Mill Pharm. v. Miller*, 465 S.W.3d 612, 617 (Tex. 2015); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628–29 (Tex. 2011).

The Court correctly observes that section 161.001(b)(1)'s "grounds for termination are not mutually exclusive" and that "the same conduct may support multiple grounds." *Ante* at ___. But there is a big difference between acknowledging some overlap among section 161.001(b)(1)'s various subsections and interpreting one subsection so broadly that it wholly encompasses the territory occupied by another. Reading these statutory provisions together, I would hold that unless a parent's period of imprisonment satisfies subsection (Q), imprisonment on its own cannot make a parent termination-eligible under subsection (E).

Similarly, subsection (E) must also be read in light of the grounds listed in subsections 161.001(b)(1)(L), (T), and (U). These subsections provide for termination based on a conviction for enumerated crimes. All agree that Father was not convicted of a crime on any of these lists. The Court nevertheless upholds the endangerment finding based on Father's criminal history, without any explanation of how his commission of these particular crimes endangered his child. To hold that his convictions show a "pattern of escalating conduct" that "endanger[ed]" his daughter under subsection (E) reads away the legislature's careful choice to make only certain convictions—and not others—a basis for termination.

Statutory history[2] further highlights the flaws in the majority's reading of subsection (E). In 1987, this Court held that "mere imprisonment will not, standing alone, constitute . . . conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533. The legislature added subsection (Q) in 1997. *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575 § 9, sec. 161.001, 1997 Tex. Gen. Laws 2012, 2015. Against the backdrop of our statement in *Boyd*,

---

[2] "[T]his is the history of the legislation, not legislative history . . . . [E]xamining how an enacted statute changes over time . . . . lend[s] helpful interpretive context," as such changes "boast the imprimatur of the Legislature as a whole." *Pruski v. Garcia*, 594 S.W.3d 322, 329 n.2 (Tex. 2020) (quoting *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 445 n.31 (Tex. 2011) (Willett, J., concurring in part)). This Court frequently consults statutory history in order to better understand legislative text. *See, e.g.*, *id.* at 328–29; *Waak v. Rodriguez*, 603 S.W.3d 103, 105–09 (Tex. 2020).

the addition of subsection (Q) is best understood as a legislative decision that in certain cases imprisonment alone *would* justify termination. We presume, of course, that "the Legislature selected the statute's language with care, choosing each word for a purpose." *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 55 (Tex. 2015). To hold that an imprisonment term falling short of that described in subsection (Q) can by itself constitute "endanger[ment]" under subsection (E) would subvert the legislature's apparent intent in (Q) to specify the duration of incarceration that will automatically support termination.

Finally, to the extent there is doubt about subsection (E)'s scope, I would follow this Court's previous direction by "constru[ing] involuntary termination statutes in favor of the parent" in cases of doubt. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). This rule of construction is no arbitrary thumb on the scale. Rather, it derives from Texas law's longstanding recognition that a parent "has . . . a paramount right to the custody of his infant child," and that "[t]he breaking of the ties which bind the father and the child can never be justified without the most solid and substantial reasons." *State v. Deaton*, 54 S.W. 901, 903 (Tex. 1900) (quoting *State ex rel. Herrick v. Richardson*, 40 N.H. 272, 275 (1860)). "[E]ven if the interpretation of [subsection (E)] adopted by the Court today were equally persuasive[,] . . . we should prefer the interpretation" that provides greater protection for the "unalienable rights" of parents, which are among the rights "retained by the people under the Ninth Amendment." *In re H.S.*, 550 S.W.3d 151, 177–78 (Tex. 2018) (Blacklock, J., dissenting).

\* \* \*

The Court agrees that imprisonment alone cannot support an endangerment finding, but it upholds the finding here by reasoning that Father's incarceration for robbery was the culmination of "increasingly serious" convictions "and their corresponding periods of imprisonment." *Ante*

at \_\_\_. The facts showing endangerment on which the Court relies are all either the commission of crimes, terms of imprisonment, or the typical disabilities associated with imprisonment. The Court emphasizes Father's "criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists." *Ante* at \_\_\_. In the Court's view, because Father "committed increasingly serious crimes," including "possession of a controlled substance, sale of marijuana, and robbery," "[t]he trial court could [have] fairly consider[ed] these convictions—and their corresponding periods of imprisonment— under subsection (E)." *Ante* at \_\_\_.

Obviously, a criminal history of escalating severity is not a mark of good character. That does not mean such a criminal history, on its own, endangers a child under the meaning of subsection (E). Again, if it did, there would be little reason for the legislature to bother enumerating specific crimes for which conviction alone makes the parent termination-eligible. Unless subsection (E) is to swallow everything in its path, we must require evidence that Father's *particular* crimes or Father's *particular* imprisonment posed *particular* dangers to his child.

Such evidence is lacking here. The bulk of the State's endangerment case focused on the actions of Mother and her boyfriend while Father was incarcerated. As for Father, most of the criminal history the Court says the trial court could "consider" in deciding whether he endangered his daughter happened *before his daughter was born*. All of Father's drug-related offenses occurred before Julie's birth. Unlike most parental-rights termination cases, there is no evidence Father had a drug problem or participated in any drug-related activities after his child was born. The Court nevertheless counts his "history of drug use" against him. *Ante* at \_\_\_. I fail to understand how drug use before a person becomes a parent can possibly be construed as endangering future children the person did not know would exist at the time of the drug use.

7

Indeed, the Court acknowledges that the only evidence about Father's history with drugs during his daughter's lifetime cuts the other way: "In the six months between his release from prison and the final hearing, Julie's father tested negative for drugs and attended twice-monthly visitation[s] with the children." *Ante* at ___.

Father did commit robbery after his daughter was born. Earlier, he also incurred an evading arrest charge after his daughter was conceived, because he "wanted to see [his] daughter born." There is no other criminal history after her birth. The Court seems to acknowledge that Father's robbery itself did not endanger his daughter, which is why the Court must bundle the drug-related offenses together with the robbery before concluding that the total package of criminal history supports an endangerment finding. Under this line of reasoning, robbery committed when the child is young may or may not endanger the child. If robbery is the culmination of an "increasingly serious" criminal history dating to before the child's birth, there is sufficient evidence of endangerment. But if there is no criminal history before the child's birth, there is no "increasingly serious" criminal history, and the robbery standing alone may be insufficient evidence of endangerment. One way or another, it seems to be Father's actions before his daughter was born that are the deciding factor in the Court's conclusion that Father's "increasingly serious" criminal history amounts to endangerment. I cannot agree with the Court that pre-parenthood crimes can be evidence of endangerment to as-yet-unconceived children.

Again, the Court does not suggest that Father's robbery itself endangered his daughter. Instead, it is the cumulation of his criminal acts—and particularly the fact that they resulted in his incarceration—which the Court says endangered her. The Court says that incarceration alone is not enough. Yet the Court also says a crime that is not itself endangering becomes endangering when it results in incarceration. If incarceration alone is not enough, how can a crime be

endangering just because it results in incarceration? *Cf. In re C.D.E.*, 391 S.W.3d 287, 297 (Tex. App.—Fort Worth 2012, no pet.) ("[T]hat Father's imprisonment exposed the children to an unstable lifestyle" was "insufficient to support" endangerment finding.).

To demonstrate how Father's imprisonment endangered Julie, the Court describes what it calls Father's "minimal effort to contact Julie or be part of decisions regarding her health, education, or well-being" during his incarceration. *Ante* at ___. In the Court's view, Julie's father's "omissions . . . exposed Julie to physical and emotional loss, as he did not care for, nurture, or protect her." *Ante* at ___. Of course, a dramatically decreased ability to "care for, nurture, [and] protect" one's children is an inevitable consequence of every imprisonment. A parent's imprisonment will always disrupt family bonds, usually to the detriment of children. If we take seriously our prior holding that imprisonment alone is not enough to show endangerment, it cannot be the case that the normal reduction in a father's ability to nurture his children due to his imprisonment amounts to endangerment under subsection (E).[3]

On the spectrum of incarcerated fathers, the evidence of this father's effort to maintain his fatherly role from prison is actually better than might be expected. During his imprisonment, he "communicated with Julie through cards, letters, and the occasional telephone call." 612 S.W.3d 373, 388 (Tex. App.—Waco 2020). Once he "receiv[ed] notice of the potential termination," he "participated in the proceedings as best he could considering his incarceration." *Id.* at 384. While in prison, he took classes to prepare for life after his release. *Id.* at 383. "The classes included cognitive intervention, parenting, and anger management" as well as "classes to help him transition

---

[3] The Court incorrectly states that "[i]n the dissent's view, a trial court must ignore evidence of criminal conduct and incarceration, however long and damaging the parent's absence is to a child's physical or emotional well-being." *Ante* at ___. To the contrary, my view is that evidence of criminal conduct and incarceration can be considered, but it is the State's burden to show that the incarceration or the crimes posed a particular danger to the child. For instance, a parent who commits a felony while knowing that his incarceration would deprive his child of any responsible caretaker may have endangered his child under subsection (E). Here, however, there was no evidence of Mother's instability or drug use until well after Father's imprisonment.

9

to life outside of prison, including prevention of alcohol and drug addiction, lifestyle changes, and managing a successful parole." *Id.* Upon his release from prison, "he engaged in services, was drug-free, and visited with a counselor two or three times." *Ante* at ___. He had "unimpeachable conduct." *Ante* at ___. He "found employment" working two jobs, secured a "residence in Tyler" suitable for him and his family, continued to "test[] negative for drugs," and he "attended twice-monthly visitation[s] with the children." *Ante* at ___; *see also* 612 S.W.3d at 383. He "paid his parole fees," "assisted Mother in paying off significant traffic fines," and "has not violated the terms of his parole." 612 S.W.3d at 383.

At bottom, the flaw in the Court's reasoning is that it "seeks to create one good argument by combining two bad ones." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting). Father's incarceration does not support an endangerment finding. Nor do any of his convictions. Although neither is enough, the Court holds that together they satisfy subsection (E). Of course, incarceration and convictions usually go together. If their confluence amounts to endangerment, it rings hollow to continue to say that "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533.[4]

---

[4] The court of appeals also found "evidence in the record from which the trial court could conclude that Julie would be placed in a situation that endangered her physical and emotional well-being" if Father had custody of Julie. 612 S.W.3d at 384. The court of appeals faulted Father for his forward-looking intent to have Mother, Julie, and Julie's siblings "live with him as a family." *Id.* The Court correctly avoids this flawed line of reasoning. Subsection (E) is explicitly backward-looking. Its placement prong is violated only if the parent "knowingly *placed* the child with persons who *engaged*" in endangering conduct. A parent's *future* plan to place his children with people the court deems dangerous is not a violation of subsection (E).

The Court also correctly avoids holding Father accountable for the endangering acts of Mother and her boyfriend. DFPS argues that Father "knowingly placed" Julie with her mother, who later endangered her, and that this is enough to show that Father violated the placement prong of subsection (E). That is wrong. One parent does not "place" his children with their other parent when he is absent. *See, e.g.*, *In re E.N.C.*, 384 S.W.3d at 806; *Walker v. Dep't of Fam. & Prot. Servs.*, 251 S.W.3d 563, 566 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (Walker did not "knowingly place[] the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children" because "Walker was in jail at the time of [mother's] actions that led to the termination of her parental rights" and because mother "was the children's mother at the time CPS intervened, therefore establishing she had custody of the children"). Furthermore, Father did not even *know* of Mother's actions until DFPS intervened.

I respectfully dissent.[5]

 

 

_____

James D. Blacklock
Justice

**OPINION DELIVERED:** May 21, 2021

---

*See* 612 S.W.3d at 385 ("There is nothing in the record to indicate that Father was notified of any of the prior [DFPS] investigations into [Mother and boyfriend] or that he otherwise knew of the conditions in which Julie was living until after the children were removed in 2017.").

[5] This is not the only case in which DFPS has found fault with a father for having the noble goal of reuniting his children and their mother to "live with him as a family." 612 S.W.3d at 384; *see also, e.g.*, *In re J.W.*, No. 10-18-00344-CV, 2019 WL 5078678 (Tex. App.—Waco Oct. 9, 2019, pet. denied). While I acknowledge that some parents are utterly incapable of caring for their children no matter the circumstances, I am troubled by the frequency with which the government takes the position in parental-rights cases that parents endanger their children by seeking to hold their troubled families together. To tell a mother that the only way to keep her children is to deny them their father—or to tell a father he must deny his children their mother, as was done in this case—is to demand by government coercion the destruction of a family. This is a gravely disquieting use of state power, however troubled the family may be. It is done by threatening the most horrific consequence imaginable for a loving parent—the loss of his children. I would like to think this only happens in Texas when all other conceivable possibilities have been exhausted, but I am not sure.